Kris JOHNSON

v.

Oswald SCHMITZ, et al

No. 3:99CV1738 (JBA).

United States District Court, D. Connecticut.

Dec. 19, 2002.

---

Daniel S. Blinn, Rocky Hill, CT, for Plaintiff.

Kris Johnson, Toledo, OH, Pro se.

Patrick M. Noonan, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, for Defendants.

### RULING ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT [DOC. # 61]

ARTERTON, District Judge.

Defendants move to enforce a settlement agreement reached in August of 2001 with Attorney James Fischer ("Fischer"), plaintiff's former counsel of record in this case. Johnson vigorously maintains that he never agreed and never told Fischer that he agreed to the terms of the settlement agreement and that therefore it is not enforceable against him. On August 19, 2002, the Court held an evidentiary hearing on defendants' motion, and solicited additional briefing from the parties. The Court concludes for the reasons set forth below that defendants' motion to enforce the settlement agreement [Doc. # 61] must be DENIED.

## I. Factual Background

Plaintiff instituted the present action in September of 1999, alleging that two professors from the Yale School of Forestry (the individual defendants) misappropriated his original ideas, and that defendant Yale not only failed to safeguard plaintiff from the professors' academic misconduct with proper remedial measures but also retaliated against plaintiff for his complaints. Following partial denial and grant of defendants' motion to dismiss [Doc. # 37], the parties conducted discovery and prepared for trial, scheduled to begin on September 5, 2001.

From June to August of 2001, the parties engaged in settlement negotiations,

including conferences before Hon. Joan Glazer Margolis. On June 14, 2001, plaintiff was present at one such conference but it failed to resolve the parties' dispute.

Subsequently Fischer had numerous telephone conversations with both Attorney Patrick Noonan ("Noonan"), defendants' counsel, and Johnson, and, as a result of those conversations, drafted a settlement proposal (the "Draft") on June 28, 2001. The one-half page Draft contained five paragraphs, including one that required the individual defendants to disclaim in writing ownership of any ideas advanced as original by plaintiff in his dissertation prospectus. According to Fischer, the Draft merely memorialized his conversations with plaintiff, including a conversation during which plaintiff had explicitly stated that the terms contained in the Draft were acceptable. Thus, Fischer understood that plaintiff would accept a settlement on the terms as written. Next, in accordance with an occasional practice of communication with Johnson, Fischer sent the Draft by facsimile to plaintiff in Ohio. Fischer maintains that, after plaintiff reviewed the Draft, he informed Fischer that it was an accurate reflection of what Fischer and plaintiff had discussed and to which plaintiff had agreed.

According to Johnson, however, plaintiff reviewed the Draft and informed Fischer that he would not agree to its terms until he had received and reviewed the written disclaimers of the individual defendants, but that the Draft was a good starting point, he was optimistic about the terms, and Fischer should proceed with negotiations.[1]

Fischer subsequently forwarded a copy of the Draft to Noonan during the first week in July of 2001. Negotiations over the Draft quickly broke down over a provision that would have allowed plaintiff to obtain his Ph.D. in evolutionary biology instead of forestry, and consequently the term requiring individual disclaimers was not substantially discussed.

On July 16, 2001, Noonan opened a settlement conference before Magistrate Judge Margolis with the announcement that the defendants were no longer interested in settling the case along the lines of previous proposals, including the Draft. Plaintiff was not present at the conference. After the conference concluded, Fischer telephoned plaintiff and informed him that all previous proposals were off the table.

On July 18, 2001, as agreed before Magistrate Judge Margolis, Noonan provided Fischer with settlement terms that he would recommend to the defendants and believed defendants would accept. Those terms were memorialized in a document entitled "Agreement to Discontinue Lawsuit" ("Agreement"). The one page Agreement contained nine enumerated paragraphs, and differed materially from Fischer's earlier Draft. Critically, the Agreement omitted the disclaimer requirements for the individual defendants, and additionally required Johnson to acknowledge that the National Science Foundation had investigated the allegations of the present lawsuit and had concluded that there was no evidence to support plaintiff's claims, including the alleged misappropriation of ideas.

Later that same day, Fischer telephoned plaintiff to discuss the Agreement. According to Fischer, Fischer and plaintiff specifically discussed each of the Agreement's nine paragraphs, identified the differences between the Agreement and the

---

1. At the evidentiary hearing on defendants' motion, plaintiff correspondingly testified that,. if Fischer had told Noonan that plaintiff agreed to settle the case on the terms set forth in the Draft contingent on plaintiff's satisfaction with the disclaimer statements, that would not have misrepresented plaintiff's position.

Draft (including the absence of written disclaimers from the individual defendants), and plaintiff said he would consider the Agreement and discuss it with others. By plaintiff's account, he and Fischer discussed only some of the Agreement's terms, and plaintiff, not having seen the terms in writing, refused to agree to any specifics. Both Fischer and Johnson agree that Fischer did not read the entire Agreement verbatim to plaintiff.

Between July 18, 2001 and early August 2001, Fischer had several more telephone conversations with plaintiff regarding the Agreement. According to Fischer, in the course of those conversations, he throughly discussed and reviewed each of the nine paragraphs in the Agreement as well as fielded plaintiff's inquiries. During one or more of these conversations, Fischer claims he recommended the settlement to plaintiff because he thought plaintiff's case was not particularly strong and that, under the Agreement, plaintiff would be able to obtain his degree and move on with his life. Plaintiff maintains that, at some point during these conversations, he explicitly informed Fischer that he rejected the terms of the Agreement.

Fischer's and plaintiff's communications over settlement culminated in telephone conversations on August 6 and 7 of 2001, regarding which there is substantial divergence between their respective recollections. Fischer maintains that, on August 7, 2001, he and plaintiff once again discussed the Agreement by telephone. During the call, Fischer informed plaintiff in substance that Yale had reversed its position.[2] Fischer maintains that he intended to convey to Johnson that Yale was willing to discuss settlement, not that Yale was agreeable to the settlement terms contained in the Draft. Fischer again recommended plaintiff settle the case under the

terms of the Agreement because he believed plaintiff's case was weak. Fischer testified that, with one modification, plaintiff approved the Agreement.

In marked contrast, Johnson recounts the following: On August 6, 2001, Fischer telephoned Johnson, who was out, and informed Amy Johnson, plaintiff's wife, that the defendants had reversed their latest position and had accepted the original proposed settlement terms. Plaintiff's wife specifically requested that Fischer clarify the terms of the settlement so that she could precisely relay the message to her husband. Fischer explained that the settlement to which defendants had agreed was the "original" one and included written disclaimers by the individual defendants. Fischer "assured [Ms. Johnson] that the written statements would be included just as in the original terms." Aff. of Amy Johnson ¶ 21. On August 7, 2001, Fischer again telephoned Johnson and directly informed plaintiff "that the defense had reversed its position and that the original settlement terms had been agreed to." Pl.'s Resp. to Def.'s Mot. at 4. Johnson claims he specifically queried whether individual defendants Schmitz and Skelly had agreed to writing the disclaimers, to which Fischer replied, "yup." Plaintiff indicated relief at defendants' willingness to settle the case on the "original" conditions but did not agree to the "original" conditions but rather awaited the arrival of both the terms and the written disclaimers.

It is undisputed that, also on August 7, 2001, Fischer informed Noonan that, with one modification, plaintiff had accepted the terms of the Agreement, and faxed a copy of the modified Agreement to Noonan with the attached notation, "Kris has agreed to this. Please let me know [defendants'] response as soon as you can." On August

---

**2.** Fischer testified that he actually did not remember if he mentioned the idea of reversal during the August 7 telephone call or an earlier one.

9, 2001, Noonan telephoned Fischer to report that all defendants had consented to terminate the litigation in accordance with the Agreement. Fischer then reported the case settlement to Magistrate Judge Margolis, this Court, and, by Fischer's account, plaintiff.

On August 13, 2001, Fischer received a copy of the Agreement signed by Noonan on behalf of defendants along with a standard release form. After confirming that they accurately reflected the parties' understanding, Fischer forwarded the Agreement and release to plaintiff to sign and return.

Sometime between August 13 and August 22, 2001, the Agreement and release reached plaintiff at his current Ohio address (Fischer having inadvertently sent the forms to Johnson's former address from which they were forwarded). Plaintiff had not previously seen the written Agreement, and Fischer's testimony confirmed that he had not sent a copy of the written Agreement to plaintiff before he reported the case settled because plaintiff both had no home facsimile machine and the text, having been drafted by Noonan, was not on his computer system and therefore could not be sent to plaintiff by electronic mail.

On August 22, 2001, plaintiff telephoned Fischer, saying that he had just received and reviewed the Agreement and release and wished to discuss them with Fischer. Fisher provides the following report of their subsequent telephone conversation:

> [Johnson] stated he had not approved and would not approve a settlement that did not include the disclaimer letters. I told him we had discussed the terms of the [Agreement], he had agreed to them and the case had been reported as settled. The plaintiff responded that his recollection was that the disclaimer letters had at one time been 'taken off the table,' but had been put back. I re-

sponded that no terms had been put back; rather, as we had discussed, the defendants' July 18 proposal was less generous than the previous proposal.

Aff. of James Fischer in Supp. of Mot. to Withdraw Appearances [Doc. # 59] at ¶ 24. Plaintiff agrees that he told Fischer he had not approved and would not approve the Agreement, in part because any settlement of the case would have to include written disclaimer letters from the individual defendants.

Fischer subsequently notified Noonan of plaintiff's refusal to carry out the terms of the settlement. This motion to enforce followed.

## II. Discussion

■■■ The lawyer-client relationship is one of agent-principal, *see U.S. v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20–21 (2d Cir.1993), within which the decision to settle a case belongs to the client alone. *See U.S. v. Beebe*, 180 U.S. 343, 350–53, 21 S.Ct. 371, 45 L.Ed. 563 (1901); *Int'l Bhd.*, 986 F.2d at 19. As an agent, the attorney may, if properly authorized, enter into contracts on behalf of and binding on the client. *See id.* at 20–21. Proper authorization generally takes two forms: actual, which can be express or implied, or apparent. *See id.* Importantly, under Connecticut law, the burden of proving that the attorney entered a contract on behalf of a client with actual or apparent authority is on the party claiming that the principal is bound by the attorney's act. *See E.R. Thomas Motorcar Co. v. Town of Seymour*, 92 Conn. 412, 103 A. 122, 122 (1918)("[W]hen it appears that the principal is acting by an agent, the burden is upon the party claiming that the principal is bound by the agent's acts to prove the authority of the agent to represent and act for the principal, and such authority usually is express or implied."); *cf. United*

*Elec. Supply Co. v. E.I. Constructors, Inc.,* No. 516455, 1993 WL 28875 at *1 (Conn.Super.Jan. 29, 1993); *Gen. Prods. Co. v. Bezzini,* 33 Conn.Supp. 654, 657–58, 365 A.2d 843 (1976).[3]

▮▮▮ A settlement agreement pursuant to which parties agree to discontinue litigation constitutes a contract that, once entered, is both binding and conclusive. *See Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir.1989); *HLO Land Ownership Assoc. Ltd. P'ship v. Hartford,* 248 Conn. 350, 356, 727 A.2d 1260 (1999)("[It is a] well established principle that ... a stipulation of the parties is to be regarded and construed as a contract.").

> The existence of [that] contract is a question of fact to be determined by the trier on the basis of all the evidence. To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties.... If the minds of the parties have not truly met, no enforceable contract exists.

*L & R Realty v. Connecticut Nat'l Bank,* 53 Conn.App. 524, 534–35, 732 A.2d 181 (1999)(quotations and citations omitted); *see also Finley v. Aetna Life & Cas. Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987)(quotations omitted)("[T]he intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were.").

▮▮▮ Thus, the crucial inquiry on which the outcome of defendants' motion turns is whether defendants have proved that Fischer had actual or apparent authority to settle plaintiff's claims when he informed Noonan on August 7, 2001 that, with one modification, plaintiff had accepted the terms of the Agreement. Importantly in this regard, proof of Fischer's actual authority to prosecute the litigation on behalf of plaintiff, which is undisputed, does not establish proof of Fischer's authority, actual or apparent, to settle. *See. Acheson v. White,* 195 Conn. 211, 213 n. 4, 487 A.2d 197 (1985)("An attorney who is authorized to represent a client in litigation does not automatically have either implied or apparent authority to settle or otherwise to compromise the client's cause of action."); *Cole v. Myers,* 128 Conn. 223, 227, 21 A.2d 396 (1941)("[The attorney] has no implied powers by virtue of his general retainer to compromise and settle his client's claim or cause of action, except in certain conditions of emergency. Either precedent special authority from his client or subsequent ratification by him is essential in order that a compromise or settlement by an attorney shall be binding on his client."). Accordingly, absent actual or apparent authorization from Johnson apart from his retention of Fischer, plaintiff's counsel's representation to defendants that plaintiff had agreed to the terms of the Agreement is insufficient to establish plaintiff's understanding and assent to the

---

**3.** For cases arising under federal law, the Second Circuit has adopted the opposite burden of proof standard. *See In re Artha Mgmt., Inc.,* 91 F.3d 326, 329 (2d Cir.1996)("[W]e presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so. In accordance with that presumption, any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority.").

The instant diversity case arises solely under the law of Connecticut, and thus Connecticut law must be applied. *See Israel v. State Farm Mut. Auto. Ins. Co.,* 293 Conn. 595, 600 (2d Cir.2002); *Belmac Hygiene, Inc. v. Belmac Corp.,* 121 F.3d 835, 840 (2d Cir.1997)("[O]f course, '[a] federal court sitting in diversity must follow the law directed by the Supreme Court of the state whose law is found to be applicable.' ")(citing *Plummer v. Lederle Labs.,* 819 F.2d 349, 355 (2d Cir.1987)).

terms of the Agreement such that it could be said to memorialize a meeting of the minds between Johnson and defendants and thus constitute a contract enforceable against plaintiff. *See, e.g., Windsor Hous. Auth. v. Fonsworth,* No. HDSP–107882, 2000 WL 949596 at *2 (Conn.Super.Jan. 28, 2000)("A common intention or meeting of the minds of the negotiating parties themselves is essential to the making of an accord, and where one party understands an agreement of settlement to be one thing, and the other party understands it to be another, there is no meeting of the minds of the parties, regardless of what the attorney conducting the negotiations believes to be his client's understanding.").[4]

 Actual authority refers to communications between the principal and agent and "may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *Int'l Bhd.,* 986 F.2d at 20 (quotation omitted). Lack of actual authority can be the result of, among other things, divergent perceptions of the principal and the agent. *See, e.g., Moore,* 2000 WL 1342549; *see also Windsor Hous. Auth.,* 2000 WL 949596.

Defendants argue that the factual record cannot support the conclusion that the disparity between Fischer's and plaintiff's accounts resulted from miscommunication, but instead is only amenable to one of two interpretations: 1) "Attorney Fischer intentionally misled his client as to the terms of the Settlement Agreement during the telephone call on August 7, 2001"; or 2) "Mr. Johnson agreed to the terms as re-flected in the Agreement and then later changed his mind". Defendants urge the latter view, asking the Court to credit Fischer's testimony while correspondingly finding Johnson's account wanting in credibility.

The Court disagrees with defendants' limitations on the scope of conclusions which are supported by the evidence, and concludes that as a result of the swirl of oral telephonic communications held in lieu of any final settlement conference with all parties present, Fischer and Johnson (an academic inexperienced in business negotiation) understood and perceived divergent substantive terms and procedural statuses of the settlement negotiations. Certainly Johnson's positive inclinations related to the Draft provided no actual authority to Fischer to settle under the terms of the materially different Agreement.

Both Johnson (and his wife) and Fischer have consistently and vigorously maintained in filings and testimony before this Court their respective accounts of events. The Court does not discern that either party is fabricating or dissembling; rather, it appears that each describes the events as each honestly perceived them.

The communication procedure which plaintiff and Fischer had used with the Draft in late June and early July of 2001 supports plaintiff's perception that, after the August 7, 2001 telephone conference with Fischer, a settlement would not be concluded until he had reviewed and commented on the relevant settlement documents. Fischer testified that, even though the Draft simply memorialized terms to

---

4. Defendants' reliance upon *Agis v. Connecticut Cmty. Care, Inc.,* No. CV92512828, 1997 WL 149774 (Conn.Super.Mar. 19, 1997) to support their contention that plaintiff's counsel's representation of agreement binds plaintiff is thus misplaced. While *Agis* supports admissibility of statements made by a party's counsel as admissions, it does not controvert the Connecticut Supreme Court's mandate in *Acheson* and *Cole* that an attorney cannot contract away a client's rights without authority. *See Moore v. State of Connecticut,* No. CV 950553888S, 2000 WL 1342549 at *3 (Conn.Super.Aug. 31, 2000).

which plaintiff had already agreed by telephone, he sent the document by facsimile to plaintiff for review, and, only after having received confirmation from Johnson after review, forwarded it to Noonan. Fischer further testified that he regretted not having used this procedure as well with respect to the Agreement.

The potential for miscommunication is further illustrated by Fischer's testimony that, after July 16, 2002, he told plaintiff about Yale's reversal of its position on settlement. Although only intending to convey that generally Yale remained willing to discuss settlement, it was not totally implausible for Johnson to have misunderstood that Yale would renew negotiations centering on the Draft.

Plaintiff's testimony that he never authorized settlement on the Agreement's terms is corroborated by his immediate objection upon his receipt of the written Agreement. While this evidence does support an inference that Johnson had a change of heart, the stronger inference is that, after reading the actual written terms, plaintiff immediately took steps to clarify that he had never agreed to settle only on those terms. Fischer himself recounts how, on August 24, 2001, after being contacted by plaintiff with objection to the settlement documents, he had to explain to Johnson that, "as we had discussed," the Agreement did not provide for individual disclaimer letters and was less generous than the Draft, an explanation which would have been unnecessary if Johnson had accurately comprehended the content of their previous conversations.

In summary, without written documents to crystalize differences between the Draft and the Agreement, the oral communications between Johnson and Fischer permitted undetected misperceptions, especially given Johnson's emotional involvement in his case, as manifested by Johnson's and Fischer's contrasting renditions

and interpretations of events. Defendants have failed to meet their burden of showing that plaintiff knew or should have known that, after hanging up the telephone on August 7, 2001, Fischer would proceed to settle plaintiff's case in accordance with the Agreement, i.e., that Fischer acted with actual authority.

 While actual authority is established by conduct occurring between principal and agent,

> [a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.... Further, in order to create apparent authority, the principal must manifest to the third party that he consents to have the act done on his behalf by the person purporting to act for him.

*Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2nd Cir.1989) (citation, quotations, and emphasis omitted); *see Tomlinson v. Bd. of Educ.*, 226 Conn. 704, 734, 629 A.2d 333 (1993). "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." *See Trs. Of UIU Health & Welfare Fund v. New York Flame Proofing Co.*, 828 F.2d 79, 83–84 (2d Cir.1987)(*quoting* Restatement (Second) of Agency § 8 cmt. c (1958)); *Tomlinson*, 226 Conn. at 735, 629 A.2d 333.

Defendants argue that plaintiff represented to defendants and defendants' counsel that Fischer was authorized to settle the case because "[p]laintiff, in the presence of defense counsel and two individual defendants [at the settlement conference on June 14, 2001] clearly acquiesced to his counsel's negotiating on his behalf, and never objected to his counsel negotiating

settlement terms during that conference or at any other time."

Defendants' argument conflates plaintiff's clear manifestation of Fischer's authority to engage in negotiations with the distinct and materially different manifestation of authority to execute or agree to a specific settlement on Johnson's behalf. *See Makins v. Dist. of Columbia*, 277 F.3d 544, 553 (D.C.Cir.2002); *Auvil v. Grafton Homes, Inc.*, 92 F.3d 226, 230–31 (4th Cir.1996); *Fennell*, 865 F.2d at 502. The former does not necessarily evidence the latter, and, since the June 14 settlement conference failed to achieve any settlement, and defendants had no further direct contact with Johnson, there was no opportunity for him to have manifested the apparent authority defendants claim.

Further doubt is cast upon the reasonableness of defendants' belief that Johnson's passive attendance on June 14, 2001 manifested Fischer's authority to settle plaintiff's claims on August 7 by defendants' transmission to Fischer of the modified Agreement signed on behalf of defendants by Noonan but including only one signature line for plaintiff, not plaintiff's counsel. *See Auvil*, 92 F.3d at 230–31 ("[Plaintiff] never indicated to [defendant] that he was relinquishing his right to approve a settlement, and [defendant] apparently recognized that fact when it later forwarded settlement papers for '[plaintiff's] approval.'"); *cf. In re Artha*, 91 F.3d at 330 (signature lines for both the defendants and defendants' attorneys indicate merely that either attorney or client could sign and therefore attempts to procure defendants' signature after defendants' counsel had already signed evince only experienced attorneys attempting to avoid later conflict over the settlement).

In conclusion, neither Johnson's retention of Fischer, *see supra* at 189, nor Fischer's apparent (and actual) authority to negotiate created apparent authority

such that defendants could reasonably have believed Johnson consented to have Fischer enter into the Agreement on his behalf. Accordingly, the Court concludes that defendants have failed to meet their burden of proof to show Fischer's apparent authority to accept the Agreement's terms and conclude plaintiff's case.

## III. Conclusion

Having concluded that defendants have failed to satisfy their burden to prove Fischer's actual or apparent authority, the Court must also conclude that there was no meeting of the minds between Johnson and defendants with respect to the Agreement, and that therefore such Agreement is not enforceable against Johnson. Accordingly, Defendants' Motion to Enforce Settlement Agreement [doc. # 61] is DENIED and the case will proceed to trial.

IT IS SO ORDERED.