YALE UNIVERSITY *v.* OUT OF THE BOX, LLC
(AC 29710)

Flynn, C. J., and DiPentima and Borden, Js.

Argued September 3, 2009—officially released January 12, 2010

*Jonathan M. Freiman,* with whom were *Robert J. Klee,* and, on the brief, *Katherine H. Hagmann,* for the appellant (plaintiff).

*William F. Gallagher*, with whom, on the brief, were *Hugh D. Hughes, David M. Krassner* and *Hugh F. Keefe*, for the appellant (defendant).

*Opinion*

DiPENTIMA, J. The plaintiff, Yale University, appeals from the denial of its motion to open and set aside a stipulated judgment. Specifically, it claims that the trial court improperly concluded that the plaintiff's attorney possessed apparent authority to enter into a settlement agreement and to bind the plaintiff to the terms of that agreement. As a result, the plaintiff contends that the court should have granted its motion to open and set aside the judgment. We are not persuaded and, accordingly, affirm the judgment of the trial court.

The origin of the plaintiff's appeal lies in a factually complex summary process action filed by the plaintiff with respect to a parcel abutting 266 College Street in New Haven, described as a shed and walkway.[1] In November, 2001, the defendant, Out of the Box, LLC, had entered into a ten year lease with the owner of 266 College Street, Asimina Antonellis. On January 26, 2005, the plaintiff obtained from Antonellis a quitclaim deed to 1016-1020 Chapel Street, which included the shed. In June, 2005, the plaintiff and Antonellis entered into a license agreement allowing Antonellis and her tenant, the defendant, use of the shed for a term of seven years. In October, 2005, the plaintiff offered a license agreement to the members of the defendant, Arturo Camacho and Suzette Franco-Camacho, for use of a walkway at the rear of 266 College Street. Additionally, after Camacho and Franco-Camacho had purchased 266 College Street, the plaintiff offered the defendant a

[1] The court explained: "The shed (at times referred to as the rear room or hut) is a cinder block structure which has been attached to the rear of 266 College Street for approximately fifty years." The walkway is located at the rear of 266 College Street.

license for use of the shed. The members, on behalf of the defendant, refused to sign the license agreement offered by the plaintiff.[2] As a result, the plaintiff filed a summary process action, claiming that neither Antonellis nor the defendant had any right or privilege to its parcel. The defendant filed, inter alia, a motion to stay the summary process action.

The court scheduled a hearing on the defendant's motion for July 10, 2006. Thomas Sansone, the plaintiff's attorney, David Newton, the plaintiff's director of university properties, Franco-Camacho and David Krassner, the defendant's attorney, met with a housing specialist in an effort to reach a settlement. The hearing then was postponed until August 10, 2006. On that date, Sansone, Newton, Franco-Camacho and Krassner continued their negotiations and reported to the court that they had reached a settlement to the satisfaction of both parties. Newton agreed to each of the terms reached during the negotiations between the parties. Sansone, on behalf of the plaintiff, and Franco-Camacho and Krassner, on behalf of the defendant, signed the settlement. After canvassing Franco-Camacho and commending the parties, the court accepted the settlement.[3]

The terms of the settlement stated that judgment of possession in favor of the plaintiff would enter, with a stay of execution through August 9, 2008, subject to

[2] Despite the quitclaim deed provided to the plaintiff, both the members, on behalf of the defendant, and Antonellis believed that valid claims of adverse possession existed with respect to the shed and a prescriptive easement as to the walkway.

[3] "Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. A court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings." (Internal quotation marks omitted.) *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993).

the following terms: (1) judgment of possession may enter in favor of the plaintiff and against the defendant; (2) the parties agree that there was no admission as to whether the plaintiff had legal title or the right to possession, and the defendant expressly retained all rights to pursue an adverse possession, prescriptive easement or related claim; (3) the plaintiff was prevented from bringing an action to quiet title; however, the defendant retained the option to do so; and (4) the plaintiff agreed to grant a minimum two year license agreement to use the parcel in question. The license agreement incorporated the following conditions: (1) a two year minimum term renewable annually unless terminated by either party; (2) if the defendant remained in possession in excess of seven years, then it would bear the cost of removing the shed; (3) any reconstruction was subject to the plaintiff's approval; and (4) the defendant expressly retained its potential adverse possession claim as to the rear door of 266 College Street and the pathway leading thereto.

On August 15, 2006, the plaintiff filed a motion to open and set aside the judgment pursuant to Practice Book § 17-4. The motion alleged that Sansone had exceeded the scope of his authority to settle the matter on the terms stipulated as a result of "a misinterpretation of the instructions that had been provided to him by the plaintiff." Attached to this motion were affidavits from Sansone, Newton, Bruce Alexander, the plaintiff's vice president for New Haven and state affairs and campus development, and Dorothy Robinson, the plaintiff's vice president and general counsel. The defendant filed an objection. Following an extended evidentiary hearing conducted over the course of several months, the court denied the plaintiff's motion to open and set aside the judgment. The court concluded that the plaintiff, acting through Alexander and Robinson, led the defendant to believe that good faith negotiations had

occurred and that the plaintiff would be bound by the action of its agent, Sansone. Specifically, the court determined that "the plaintiff failed to show that . . . Sansone lacked authority. Instead, the evidence leads to the conclusion that . . . Sansone had apparent authority to enter into the stipulation." This appeal followed.

Our Supreme Court expressly has stated: "The procedural posture of this case determines the scope of our review." *Ruddock* v. *Burrowes*, 243 Conn. 569, 573, 706 A.2d 967 (1998); see also *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306, 695 A.2d 1051 (1997) ("[o]ur consideration of these claims is hindered, however, by the procedural posture in which the present case arrived at our doorstep"). Our case law is replete with examples of the significance of procedural posture to appellate review. See, e.g., *Tellar* v. *Abbott Laboratories, Inc.*, 114 Conn. App. 244, 245, 969 A.2d 210 (2009) (when reviewing pretrial motion to dismiss, allegations taken in most favorable light to nonmoving party); *Misata* v. *Con-Way Transportation Services, Inc.*, 106 Conn. App. 736, 740, 943 A.2d 537 (2008) (posture of case determined whether this court considered merits of underlying judgment or limited to whether trial court abused discretion in denying motion to open); *Samaoya* v. *Gallagher*, 102 Conn. App. 670, 675, 926 A.2d 1052 (2007) (due to failure to file motion to correct findings in workers' compensation case, party unable to challenge findings on appeal).

The procedural posture of the case before us is the denial of a motion to open and set aside a judgment. "The principles that govern motions to open or set aside a civil judgment are well established. Within four months of the date of the original judgment, Practice Book [§ 17-4] vests discretion in the trial court to determine whether there is a good and compelling reason for its modification or vacation. . . . The exercise of

equitable authority is vested in the discretion of the trial court and is subject only to limited review on appeal. . . . *We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . .* In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Emphasis added; internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 94–95, 952 A.2d 1 (2008); see also *Gillis* v. *Gillis*, 214 Conn. 336, 337, 572 A.2d 323 (1990); *Eremita* v. *Morello*, 111 Conn. App. 103, 105–106, 958 A.2d 779 (2008); *Cox* v. *Burdick*, 98 Conn. App. 167, 176, 907 A.2d 1282, cert. denied, 280 Conn. 951, 912 A.2d 482 (2006); *Magowan* v. *Magowan*, 73 Conn. App. 733, 737, 812 A.2d 30 (2002), cert. denied, 262 Conn. 934, 815 A.2d 134 (2003). The posture of the present case is whether the court properly denied the motion to open the stipulated judgment between the parties. It follows that we review such a claim pursuant to the abuse of discretion standard.[4]

[4] We are not persuaded by the dissent's citation to *Water Pollution Control Authority* v. *OTP Realty, LLC*, 76 Conn. App. 711, 713–14, 822 A.2d 257, cert. denied, 264 Conn. 920, 828 A.2d 619 (2003). In that case, because the defendant claimed that the plaintiff lacked standing and thus implicated the court's subject matter jurisdiction, we employed the plenary standard of review. Id. The lack of the court's subject matter jurisdiction is readily distinguishable from a claim that a motion to open was denied improperly.

We are also aware of our Supreme Court's decision in *Wallerstein* v. *Stew Leonard's Dairy*, 258 Conn. 299, 780 A.2d 916 (2001). In that case, following a stipulated judgment, the plaintiff sought an award of attorney's fees pursuant to General Statutes § 52-240a. Although the dissent in *Wallerstein* characterized the appeal as whether the trial court had abused its discretion in denying the plaintiff's motion to open; id., 308–309 (*Zarella, J.*, dissenting); the majority determined that the issue was one of statutory construction and therefore utilized the plenary standard of review. Id., 302–307.

The issues of standing, subject matter jurisdiction or statutory interpretation are not before us. Undeniably, our jurisprudence requires the plenary standard of review for such claims. The present case concerns only the

On appeal, the plaintiff claims that the court improperly concluded that Sansone possessed apparent authority to enter into a settlement agreement and bind the plaintiff to the terms of the agreement. We note that in both its appellate brief and at oral argument before this court, the plaintiff expressly disavowed any challenge to the relevant factual findings made by the trial court. Instead, the plaintiff maintains that the court's legal conclusion that Sansone had apparent authority was improper.[5] We are not persuaded that the court acted unreasonably or abused its discretion in denying the plaintiff's motion to open and set aside the judgment.

A brief discussion of the law of agency will facilitate our discussion. "Agency is defined as the fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. 1 Restatement (Third), Agency, § 1.01, p. 17 (2006)." (Internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 274, 976 A.2d 750 (2009). As a general

issue of whether the court abused its discretion or acted unreasonably in denying the plaintiff's motion to open the stipulated judgment.

[5] In its appellate brief, the plaintiff acknowledges the abuse of discretion standard with respect to our review of the denial of a motion to open and set aside. It then notes that ordinarily, the question of proof of agency is a question of fact. See *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 606, 799 A.2d 1027 (2002); see also *Host America Corp.* v. *Ramsey*, 107 Conn. App. 849, 858, 947 A.2d 957, cert. denied, 289 Conn. 904, 957 A.2d 870 (2008). The plaintiff correctly argues that when the facts are undisputed; *Russo* v. *McAviney*, 96 Conn. 21, 24, 112 A. 657 (1921); or when no reasonable fact finder could find that an agency relationship existed; *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 673–74, 686 A.2d 491 (1997); then the issue of agency becomes a legal question. Nevertheless, the ultimate question before us is whether the trial court abused its discretion or acted unreasonably in denying the plaintiff's motion.

matter, a principal is liable for the acts of its agent. *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 673, 686 A.2d 491 (1997). An agent's authority may be actual or apparent. *State* v. *Marsala*, 116 Conn. App. 580, 585–86, 976 A.2d 46, cert. denied, 293 Conn. 934, 981 A.2d 1077 (2009).

"Apparent authority is that semblance of authority which a *principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . .* Consequently, *apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . .* The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Citations omitted; emphasis added; internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 704, 734–35, 629 A.2d 333 (1993); see also *Gordon* v. *Tobias*, 262 Conn. 844, 850–51, 817 A.2d 683 (2003); 1 Restatement (Third), supra, § 2.03, p. 113. This type of authority may be derived from a course of dealing. *Hall-Brooke Foundation, Inc.* v. *Norwalk*, 58 Conn. App. 340, 346, 752 A.2d 523 (2000); see also *Edart Truck Rental Corp.* v. *B. Swirsky & Co.*, 23 Conn. App. 137, 140, 579 A.2d 133 (1990).

The general rules regarding agents and apparent authority become more complicated when, as in the present case, the agent is a lawyer who has settled a case for his or her client. See generally J. Parness & A. Bartlett, "Unsettling Questions Regarding Lawyer Civil

Claim Settlement Authority," 78 Or. L. Rev. 1061 (1999). One court aptly has observed that the intersection of ethical guidelines,[6] contract law, agency law, the attorney-client relationship and policy considerations[7] is the reason for the difficulty in determining the extent of an attorney's authority to effectuate a settlement without the express authorization of the client. *Makins* v. *District of Columbia*, 861 A.2d 590, 593 (D.C. 2004). Our Supreme Court expressly has noted that "[a]n attorney who is authorized to represent a client in litigation does not automatically have either implied or apparent authority to settle or otherwise to compromise the client's cause of action." *Acheson* v. *White*, 195 Conn. 211, 213 n.4, 487 A.2d 197 (1985); *Cole* v. *Myers*, 128 Conn. 223, 227, 21 A.2d 396 (1941).[8]

The court found that Sansone had been retained by the plaintiff in 1986 and had been involved in the dispute

---

[6] See rule 1.2 (a) of the Rules of Professional Conduct ("[a] lawyer shall abide by a client's decision whether to settle a matter").

[7] "To be sure, settlement of disputes . . . is to be encouraged as sound public policy. . . . [Nevertheless, as] between the client and the third party, the third party should bear the risk of an unauthorized settlement because the third party should know that settlements are normally subject to approval by the client . . . ." (Citations omitted; internal quotation marks omitted.) *Makins* v. *District of Columbia*, 861 A.2d 590, 597 (D.C. 2004). Under the facts of the present case as well as the limited standard of review that we must employ here, the latter policy does not prevail.

[8] In its brief, the plaintiff refers to certain language from *Cole* v. *Myers*, supra, 128 Conn. 223, in support of its argument that the court improperly determined that Sansone had apparent authority to settle the summary process action. "The rule is almost universal that an attorney *who is clothed with no other authority* than that arising from his employment in that capacity had no implied powers by virtue of his general retainer to compromise and settle his client's claim or cause of action, except in certain conditions of emergency. Either precedent special authority from the client or subsequent ratification by him is essential in order that a compromise or settlement by an attorney shall be binding on his client." (Emphasis added.) Id., 227. We note that in the present case, the court found that Sansone had been clothed with apparent authority. Because the court in *Cole* was not describing apparent authority, the three conditions detailed in that case, emergency, precedent condition and subsequent ratification, would not appear to apply here to bind the plaintiff to the actions of Sansone.

over the shed and walkway from 2001. Sansone had engaged in extensive negotiations with the defendant regarding the various property issues. During this time, Sansone worked closely with Newton, who also had substantial contact with the defendant and its attorney. Additionally, Sansone and Newton had participated in discussions regarding the lease of 1044 Chapel Street, a nearby restaurant location owned by the plaintiff and leased to Camacho and Franco-Camacho. Sansone had considerable correspondence with Krassner, the defendant's lawyer for over four years. Finally, Franco-Camacho contacted Alexander directly, via e-mail, in an effort to resolve the dispute. This e-mail began: "I write to you at the risk of asking for your involvement on an issue that is most certainly otherwise below your concern." Franco-Camacho indicated a willingness to sign a license agreement and requested "ten minutes of [Alexander's] time . . . ." Alexander, Newton's supervisor, responded to Franco-Camacho's e-mail but did not correct or address her statement that this matter was below his concern.[9] On the day of the settlement, both Sansone and Newton were present, and Newton approved each term contained in the written agreement between the parties.

Simply put, this is not a case in which the court found apparent authority simply as a result of retaining a lawyer and having him negotiate on behalf of a client. See, e.g., *Acheson* v. *White*, supra, 195 Conn. 213 n.4. Instead, on the basis of the totality of the circumstances of this case, the court reasonably determined that Sansone had apparent authority. See 1 G. Hazard & W. Hodes, The Law of Lawyering (3d Ed. Sup. 2003) § 5.7, pp. 5-22 through 5-22.2; see, e.g., *Hudson United Bank*

___

[9] Alexander's e-mail indicated that he had reviewed the actions taken by "University Properties" and concluded that appropriate actions had been taken. He consistently referred to "University Properties" as "they" and gave no indication of any authority over that group. He did not direct, order or instruct University Properties; instead he "asked" and "requested" that they resolve the issue of an unsigned lease with Franco-Camacho. Most

v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 573–74, 845 A.2d 417 (2004) (although general rule is that corporate vice president lacks inherent authority to bind corporation, in certain cases that individual may have apparent authority to do so). There is no finding that either the members of the defendant or Krassner were told or made aware that Alexander's approval was required to settle the dispute. The plaintiff acknowledged that Alexander and Robinson had delegated the authority to negotiate to Newton and Sansone.[10] When Franco-Camacho presented the matter directly to Alexander, he failed to indicate that his approval was necessary; instead, his e-mailed response acted as confirmation that the matter was, as described by Franco-Camacho, "below [his] concern." In other words, the issue of authority was raised with Alexander, and he did not address that issue. By this omission or inadvertence, Alexander caused or allowed the members of the defendant to believe that Sansone, part of the team that had been, in effect, the "face" of the plaintiff, possessed the authority to settle the dispute. Finally, Newton, a direct subordinate to Alexander and an employee of some consequence, was present at the time the parties reached the settlement and voiced no opposition to any of the terms.[11] The court properly determined that the actions and inactions of the plaintiff, the principal, caused or allowed the defendant reasonably to believe that Sansone, the agent, had the

importantly, nothing in the e-mail would dispel Franco-Camacho's belief that the matter was beneath Alexander's concern or would suggest that he had to approve any settlement.

[10] "It is well settled . . . that a corporation is a distinct legal entity that can act only through its agents." *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 505, 656 A.2d 1009 (1995).

[11] Although the court did not expressly find that Newton had received authority to settle the matter on his own, the fact that he had received the authority to engage in settlement discussions with the defendant is significant on its own. Sansone was accompanied by an employee of the plaintiff of some importance and when the terms of the settlement were finalized, Newton agreed to each term. This fact buttresses the claim that Sansone had the apparent authority to complete the settlement.

authority to enter into and to bind the plaintiff to the settlement with the defendant.[12]

Last, as discussed previously, the question is limited to whether the court abused its discretion or acted unreasonably in denying the motion to open and set aside. We are required to make every reasonable presumption in favor of its action. Accordingly, we conclude that the court did not abuse its discretion in denying the plaintiff's motion to open.

The judgment is affirmed.

In this opinion FLYNN, C. J., concurred.

BORDEN, J., dissenting. The majority's opinion rests on two premises, namely, that (1) our scope of review is limited to whether the trial court abused its discretion in denying the motion to open and set aside the stipulated judgment in question and (2) in light of that limited scope of review, there was sufficient evidence in the record to support the trial court's determination that Thomas Sansone, the attorney for the plaintiff, Yale University, had apparent authority to enter into that judgment. I disagree with both premises. I therefore dissent.

I begin with the scope of our review. As the majority opinion acknowledges, the plaintiff has expressly disavowed any challenge to the facts found by the trial

---

[12] The plaintiff also argues that the court failed to find that the defendant's belief that Sansone had the necessary authority to bind it was not reasonable. We simply note that the court concluded that Robinson and Alexander, "by their actions or lack thereof, left the parties to believe that they were negotiating in good faith and [that the plaintiff] would be bound by the actions of its agent." It further observed that the plaintiff failed to meet its burden to show that Sansone lacked authority. It is implicit in the court's decision that it found that the belief of Franco-Camacho that Sansone had the authority to settle the matter was reasonable. Because the plaintiff does not challenge any of the court's factual findings, we need not address this argument further.

court. Although the question of agency is a question of fact when the evidence is conflicting or is susceptible of more than one reasonable inference; *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 606, 799 A.2d 1027 (2002); agency becomes a question of law when, as in the present case, the facts are undisputed. *Russo* v. *McAviney*, 96 Conn. 21, 24, 112 A. 657 (1921). Furthermore, it is a question of law when, as I will discuss, no reasonable fact finder could find agency in the circumstances of this particular case. *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 674, 686 A.2d 491 (1997). Although, as the majority notes, ordinarily the scope of appellate review of a trial court's ruling on a motion to open a judgment is abuse of discretion, that scope of review does not apply when, as in the present case, the decision on that motion depends entirely on the purely legal question of whether, under the undisputed facts of the case, Sansone had apparent authority to stipulate to the judgment in question. Put another way, a trial court cannot have discretion to deny a motion that depends entirely on a question of law. See *Water Pollution Control Authority* v. *OTP Realty, LLC*, 76 Conn. App. 711, 713–14, 822 A.2d 257 (plenary review applies when purely legal question concerning standing was presented in motion to open), cert. denied, 264 Conn. 920, 828 A.2d 619 (2003). Thus, contrary to the approach of the majority, the trial court's conclusion that Sansone had apparent authority is not entitled to deference on appeal. We review that conclusion de novo.

I turn next, therefore, to the question of whether, on the undisputed facts of the present case, Sansone had apparent authority to bind the plaintiff to this stipulated judgment. I would conclude that he did not.

The law of apparent authority is well settled, particularly as it applies, as in the present case, to the apparent

authority of an attorney to bind his client by way of stipulating to a judgment. "Apparent authority must be derived not from the acts of the agent but from the acts of his principal. [T]he acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority."[1] (Internal quotation marks omitted.) *Hallas* v. *Boehmke & Dobosz, Inc.*, supra, 239 Conn. 674. It *"must appear from the principal's conduct that the principal held the agent out* as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority."* (Emphasis added.) *Gordon* v. *Tobias*, 262 Conn. 844, 851, 817 A.2d 683 (2003). Thus, only a principal with actual authority can clothe an agent with apparent authority, and that clothing must appear from his conduct or his knowing permission of the agent's acting as if he had such authority.

Furthermore, it is unquestioned that the authority to settle a claim rests with the client, not the attorney. *Rodriguez* v. *State*, 76 Conn. App. 614, 623–24, 820 A.2d 1097 (2003). "An attorney who is authorized to represent a client in litigation does not automatically have either implied or apparent authority to settle or otherwise to compromise the client's cause of action." *Acheson* v. *White*, 195 Conn. 211, 213 n.4, 487 A.2d 197 (1985). The authority of an attorney to negotiate on behalf of a client does not imply actual authority or

---

[1] In the present case, it is clear to me that the defendant has not met the first part of this two part test, namely, whether the principal held out the agent as having sufficient authority or knowingly permitted him to act as having such authority. I therefore do not discuss the second part of the test. I note, however, that the plaintiff also claims that the second part of the test was not satisfied by the evidence in the case.

clothe him with apparent authority to settle a matter. See *Norwalk* v. *Board of Labor Relations*, 206 Conn. 449, 453, 538 A.2d 694 (1988) (counsel with authority to negotiate on behalf of client "was without authority to bind [client] to a settlement"); see also *Johnson* v. *Schmitz*, 237 F. Sup. 2d 183, 192 (D. Conn. 2002) (counsel's authority to engage in negotiations is "distinct and materially different [from his] authority to execute or agree to a specific settlement"). Application of these principles leads to the conclusion that Sansone had no apparent authority to enter into the stipulated judgment on behalf of the plaintiff.

First, it is worthy of note that, as the plaintiff explains, this judgment had at least one significant adverse effect on the plaintiff's claim to ownership of the property in question, which is located in downtown New Haven. Under the terms of the stipulation, despite the fact that the defendant, Out of the Box, LLC, did not concede the plaintiff's right to ownership or possession of the parcel in question, and despite the fact that the defendant retained the right to bring claims of adverse possession, prescriptive easement or related claims, thus creating clouds on the title, only the defendant, and not the plaintiff, could bring a quiet title action. Thus, if someone approached the plaintiff to buy the property, the plaintiff would be at the defendant's mercy insofar as clearing the title of the clouds created by the defendant's claims is concerned.

Second, the question of whether Sansone had apparent authority to enter into this stipulation has been clarified by three appropriately candid concessions of the defendant at oral argument in this court. The defendant candidly acknowledged that (1) neither David Newton, the plaintiff's director of university properties, nor Sansone had actual authority to settle the case, (2) only Bruce Alexander, the plaintiff's vice president for New Haven and state affairs and campus development,

had actual authority to settle the case and (3) therefore, to prevail, the defendant must have established that Alexander clothed Sansone with apparent authority. This is clear, moreover, from the bylaws of the plaintiff, introduced into evidence, and from the undisputed fact that throughout the lengthy negotiations, all of the proposed leases and other documents showed Alexander's signature as acting on behalf of the plaintiff. Indeed, Suzette Franco-Camacho, one of the defendant's principals, testified specifically that Alexander never told her that Sansone had authority to settle, and that she was led to believe that he had such authority solely from the fact that he had been negotiating on the plaintiff's behalf and that he appeared in court. Furthermore, the defendant's attorney testified that " 'the only people that possibly could have' " led him to believe that Sansone had authority to settle were Sansone himself and Newton.

The question, then, becomes quite simple: did Alexander do anything to clothe Sansone, the plaintiff's attorney, with apparent authority, or knowingly permit him to act as if he had actual authority, to settle this matter? The answer is clearly no. All that Alexander did was to permit Sansone to enter into a series of *negotiations* with the defendant and to send Sansone to court to *negotiate* in an effort to reach a settlement of the matter. Negotiation is precisely what attorneys are hired to do on behalf of a client, but it is the client that makes the decision on settlement. The authority of an attorney to negotiate on behalf of a client, which is unquestioned, does not and cannot clothe him with apparent authority to settle the case on the client's behalf. *Norwalk* v. *Board of Labor Relations*, supra, 206 Conn. 452; *Johnson* v. *Schmitz*, supra, 237 F. Sup. 2d 192.

The only matters that the majority relies on for the assertion that Alexander clothed Sansone with apparent authority to settle are: (1) the lack of a finding that

"either the . . . defendant or [its attorney] were told or made aware that Alexander's approval was required to settle the dispute"; and (2) Alexander's response to an e-mail sent to him by Franco-Camacho, in which Franco-Camacho had asked for Alexander's involvement in what *Franco-Camacho*, not Alexander, characterized as "otherwise below your concern," a characterization that, according to the majority, Alexander "did not correct or address" in his response. From these, the majority argues that "the issue of authority was raised with Alexander, and he did not address that issue. By this omission or inadvertence, Alexander caused or allowed the members of the defendant to believe that Sansone, part of the team that had been, in effect, the 'face' of the plaintiff, possessed the authority to settle the dispute."[2] This simply cannot be.

First, the majority's reliance on the lack of a finding that either the defendant or its attorney was told that Alexander's approval was required for the settlement turns the law on its head. When the apparent authority of an attorney to settle is at issue, it is the other party's burden to establish that the principal and client—in this case, Alexander—clothed the attorney with apparent authority; it is not the principal's or client's burden to

---

[2] The majority also cites the fact that Newton, Alexander's subordinate, who, the majority recognizes, "had received the authority *to engage in settlement discussions*"; (emphasis added); was present when Sansone stipulated for the settlement and "agreed to each term," as support for "the claim that Sansone had the apparent authority to complete the settlement." This fact cannot provide any such support. First, the authority to engage in settlement discussions—which means no more than the authority to *negotiate*—does not imply the authority to *settle*. Second, it escapes me how a subordinate's authority to negotiate, along with the principal's attorney, can provide support for the assertion that his principal clothed the attorney with the apparent authority to settle. Third, it is undisputed that Newton had no authority to settle; indeed, the defendant's concession that only Alexander had such authority completely strips Newton's conduct of any support for the claim that Alexander clothed Sansone with such apparent authority.

show that it told the other party that only the client, and not the attorney, has the authority to settle.

Second, the lengthy e-mail exchange between Franco-Camacho and Alexander not only is wholly bereft of support for the weight placed on it by the majority, it belies that support. The exchange began with a lengthy, unsolicited e-mail, the date of which is not indicated, from Franco-Camacho to Alexander, the full text of which is set forth in footnote 3 of this opinion.[3] On May 19, 2006, nearly four months before the

---

[3] The full unedited text of the e-mail sent by Franco-Camacho to Alexander provides as follows:

"Dear Bruce,

"I write to you at the risk of asking for your involvement on an issue that is most certainly otherwise below your concern. I know how busy you are especially since you recently took on additional responsibilities at the university. But in the past we were incredibly appreciative of your generosity to help us resolve a very difficult situation regarding the aftermath of Franco's arrest. As we fear we are facing difficult times again, this time surrounding the easement issues from our building, I hoped it would not be considered too forward for me to reach out one last time in hopes that perhaps there is still a solution that could avoid a legal process and still put your concerns at ease.

"I should say, I know that I can be stubborn at times (though one can't really survive in our business without a little persistence) and I did resist for quite some time to understand the importance of eliminating any potential future adverse possession claims on your property. But now that we are finally in the position (for the first time) of being able to sign the license agreement as the owner rather than wait for the previous owner to sign on our behalf, I have come to understand that the agreement is about preserving the university's future growth and there are probably few parcels left for you to develop. Sometimes we restaurateurs can be stuck in the present in order to remain successful but I've come to appreciate that it must be difficult sometimes to protect the long-term interests of the university at the expense of otherwise reasonable requests that are short-term in comparison. I can only presume that this is the difficult situation in which the university stands but it requires maintaining tough lines at times.

"I hope also that you can appreciate how far we've come in complying with your initial requirements regarding the easement issues. Four years and several hundred thousand dollars later, we were able to accommodate a second means of egress inside by giving up a sizeable amount of dining space. I have come to understand now that for the university to protect its future right against all adverse possession claims, that perhaps there can be no physical structures existing on your property. I should say that I

## "settlement" at issue in this case, Alexander replied at

would be very grateful if there were a way to sign a waiver to any and all future claims and continue leasing the shed even with a termination clause that allows you short notice for removal. But even that is not as important to me now as simply the right for my family and only my family to be able to exit the rear of the building. Years ago, when these discussions began, David Newton had consistently told us that if we made the investment in creating a second means of egress inside the space, that he would ensure that, just for our personal use, we would be given some license to be able to exit.

"This last consideration has become so important to me because of the implications for my children. To me knowledge, we are the only family with young children that has made the commitment to pioneer in downtown living by buying a residence that is right in the middle of the downtown. As I watch all these condos go up around me and hear that the developers are struggling to recruit families into their buildings, I am eager to show that our story has been so positive in hopes that it will continue to help the revitalization of downtown. However, these past few months without access through the back have been difficult and I am very afraid of the impact opening our restaurant is going to have on our ability to continue to live above. If I can't walk my dogs or bring my children in and out of our home without taking them through the restaurant, I have to consider the substantial negative impact this will have on them. We have been proud to be a part of the downtown renaissance and we hope that the investment we've made both in our home as a model of what downtown living can be and also our newest restaurant will continue to set high standards for the downtown. That is the most important part of we have respected deeply that it is also your top priority as well. But I am also a mother and I must worry about my kids. Being a small business owner of any kind is always difficult but being a restaurateur has even far greater challenges to raising a family and I am worried that if we do not have a safe place for my children and our pets to enter and exit in the evenings when the restaurant is open then I may not be able to continue living downtown and then, after pioneering for so long, I fear we will only have proven the 'nay-sayers' right that downtown new haven isn't a place for families to live.

"If signing the license agreement could still allow us this consideration for our family, then I would be eager to sign it. But as I see this process push down a certain path, I was wondering if there wasn't a way to step back on last time and perhaps with ten minutes of your time I could show you the issues at the building so that you could see the situation as we see it and even perhaps if you could help us see alternatives that could alleviate the issue that perhaps we haven't seen ourselves. Again, at this point, the only issue that I see as insurmountable is the ability for my family to have a private exit and entrance into our home that does not pass through the restaurant. I suppose I am recalling these few times in the past when you have stepped in and shown us great neighborly support and I am hoping

length with an e-mail of his own, the full text of which is set forth in footnote 4 of this opinion.[4]

Nowhere in either e-mail is Sansone even mentioned, either by name or by reference to his role as the plaintiff's attorney. Furthermore, contrary to Franco-Camacho's characterization that the matter of the dispute between the plaintiff and defendant was "otherwise below [Alexander's] concern," the fact of and the

that perhaps it could be possible to trouble you once more in this way knowing you probably have the most experience with these issues and that your intentions both for the university and for downtown development are the most pure.

"I am writing this letter outside the legal process that has begun intentionally to your attention. If you find it isn't possible to meet with us briefly, I would be grateful if you could get back to me directly so that I at least know it has reached you.

"Thank you very much for your time to read this note.

"Best Regards,

"Suzette"

[4] The full unedited text of Alexander's reply e-mail to Franco-Camacho provides as follows:

"Dear Suzette,

"Thank you for your email. After carefully reviewing the matters about which you wrote I feel University Properties has acted appropriately.

"As much as University Properties would like to be neighborly, there are now plans to develop the lot in question and it is inappropriate to use the University's property—at a substantial loss of useable land for future development—to provide an easement for the convenience of an adjacent property owner. There is also little point providing a temporary solution when a permanent one will need to be found shortly.

"With respect to the second issue of the shed on our property, my review of the correspondence indicates that University Properties has made it clear that they have always been willing to grant you a license for its use, but the University must be protected from liability. Since they are trying to accommodate you, it seemed peculiar that your lawyer should demand a series of concessions in return for your signing it. He must feel that you have property rights and the only way to resolve that matter, if the license is not signed, is through the courts, regrettable though that is.

"I now also understand that you have never signed the renewal of the Roomba lease, a matter which is well over a year old. Since this distinguishes you from our other 84 retail tenants I have asked University Properties to send you new execution copies and have requested that they resolve the matter promptly with you.

"We respect and recognize your hard work and contributions to New Haven and continue to wish you and your family well with your endeavors.

content of Alexander's reply indicates clearly that it was definitely *within* his concern.[5] Thus, the fact that Alexander did not specifically address Franco-Camacho's characterization of "the matter" between them, in the majority's phrasing—which "matter" was, by the way, not the question of Alexander's authority, as the majority suggests, but the underlying real estate dispute—in no way can be construed as confirming that characterization. Alexander had no duty specifically to address every assertion or characterization in Franco-Camacho's lengthy and, at times, very personal, e-mail. He certainly cannot be held to have clothed Sansone with apparent authority to enter into a settlement four months later merely by not specifically addressing that characterization, in the context of a response that, on its face, specifically did address the substance of her concerns and showed that he was directly concerned with those concerns on the plaintiff's behalf. Finally, the majority's metaphorical assertion that Sansone was "part of the team that had been, in effect, the 'face' of the plaintiff," adds nothing to the analysis of apparent authority. The "team" was vested solely with the authority to negotiate, which is what attorneys and subordinates normally do on behalf of their clients and

---

"Best regards,

"Bruce Alexander"

[5] I confess that I am baffled by the majority's reliance on the passing references in Alexander's response to the role of university properties. Although the majority does not make clear what or who "university properties" is, the record does so. Newton was director of university properties and, as such, reported directly to Alexander, and was responsible for day-to-day management of the plaintiff's apartment units, retail spaces (including the parcel at issue in this case), and office space. It is clear, therefore, that university properties was simply the real estate arm of the plaintiff, under the authority of Alexander. Indeed, the majority's reliance on these passing references is even more inexplicable in light of the fact that both Franco-Camacho and the defendant's attorney specifically testified that nothing Alexander had said had led them to believe that Sansone had authority to settle; there was no evidence that the defendant, either by its principals or its attorney, relied on these passing references in forming their belief that Sansone had authority to settle.

principals. Therefore, if Sansone was the "face" of the plaintiff, he was the negotiating "face," which did not, absent something from Alexander clothing him with apparent authority, give him apparent authority to settle the case. In this case, there simply was no such "something."

The wise words of the United States Court of Appeals for the Second Circuit in a similar case bear repeating here. "We realize that the rule we announce here has the potential to burden, at least occasionally, [trial] courts which must deal with constantly burgeoning calendars. A contrary rule, however, would have even more deleterious consequences. Clients should not be faced with a Hobson's choice[6] of denying their counsel all authority to explore settlement or being bound by *any* settlement to which their counsel might agree, having resort only to an action against their counsel for malpractice." (Emphasis in original.) *Fennell* v. *TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir. 1989).

Whether one views this case through the prism of a total lack of evidence to support a determination of apparent authority in Sansone or through the prism that no reasonable fact finder could find apparent authority, the conclusion is the same. Sansone had no apparent

[6] I note that the use of the term "Hobson's choice" was inaccurate under the circumstances in *Fennell* v. *TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir. 1989). "That term does not signify a situation in which either alternative may be unfavorable; rather, it represents an illusory choice that is, in fact, no choice at all." *State* v. *Perkins*, 271 Conn. 218, 273 n.2, 856 A.2d 917 (2004) (*Katz, J.*, dissenting); see also *State* v. *Messler*, 19 Conn. App. 432, 436 n.3, 562 A.2d 1138 (1989) ("The term is derived from the practice of Thomas Hobson . . . an English liveryman, of requiring each customer to take the next available horse. Thus, in modern usage a Hobson's choice is '[a]n apparent freedom of choice with no real alternative.' American Heritage Dictionary of the English Language, New College Edition, [p.] 626."). Consequently, a Hobson's choice is not a choice between two nags; it is, instead, the "choice" to take the nag that is chosen for you. The course that the court in *Fennell* was deploring was a choice between two unfavorable alternatives, not an illusory choice that was, in fact, no choice at all.

authority to bind his client to this settlement, and the client should not be bound by it.

I would, therefore, reverse the judgment and remand the case with direction to grant the motion to open and set aside.