******************************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopin-
ion motions and petitions for certification is the "offi-
cially released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports, the latest
version is to be considered authoritative.

The syllabus and procedural history accompanying
an opinion that appear in the Connecticut Law Jour-
nal and subsequently in the Connecticut Reports or
Connecticut Appellate Reports are copyrighted by the
Secretary of the State, State of Connecticut, and may
not be reproduced or distributed without the express
written permission of the Commission on Official Legal
Publications, Judicial Branch, State of Connecticut.

******************************************************

# ANDREAS S. HADJI *v.* PATRICK T. SNOW ET AL.
## (AC 46668)

Elgo, Suarez and Seeley, Js.

*Syllabus*

The defendants, a real estate developer, S, and six limited liability companies that S owned or controlled, appealed from the trial court's judgment for the plaintiff on his breach of contract claim and with respect to special defenses and a counterclaim filed by the defendants. The defendants claimed, inter alia, that the court improperly determined that there was proper consideration to support the parties' written agreement relating to the plaintiff's employment. *Held*:

The trial court's implicit finding that S had apparent authority to bind the defendant F Co. to the agreement was not clearly erroneous because F Co., by placing S in a position of authority as the manager of the company and permitting him to carry on business for the company, created an appearance that S had authority to manage the company, which could have included entering into an employment contract with an employee on behalf of F Co., and the plaintiff reasonably could have believed that S had authority to enter into the agreement on behalf of F Co.

The defendants' claim that the trial court improperly determined that there was proper consideration to support the agreement as to each of the defendant companies failed because the defendants did not address the court's findings that the plaintiff's promises to continue to perform work for the defendant companies after the execution of the agreement and to relinquish his membership interest in one of the defendant companies constituted adequate consideration for the defendants' promise to make payments to the plaintiff as set forth in the agreement, and, accordingly, the defendants failed to meet their burden of demonstrating error in the court's ruling.

This court declined to review the defendants' claims that the trial court improperly failed to find that the interest charged under the agreement was unconscionable and that certain correspondence between the plaintiff and S was part of the agreement, as those claims were inadequately briefed.

The damages awarded to the plaintiff by the trial court incorrectly included duplicative base damages, and, accordingly, this court reversed the judgment as to the damages award and remanded the case with direction to render judgment in an amount that included base damages and the plaintiff's calculation of the interest owed, which the defendants did not challenge on appeal.

Argued November 14, 2024—officially released June 3, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the court, *Morgan, J.*, granted the plaintiff's motion to cite in Oman Trust, LLC, as a defendant; thereafter, the named defendant et al. filed a counterclaim; subsequently, the case was tried to the court, *Knox, J.*; judgment for the plaintiff, from which the named defendant et al. appealed to this court. *Reversed in part; judgment directed.*

*Ross G. Fingold*, for the appellants (named defendant et al.).

*Ryan P. Driscoll*, for the appellee (plaintiff).

*Opinion*

SEELEY, J. In this action for breach of contract, the defendants Patrick T. Snow, a real estate developer, and six limited liability companies owned and/or managed by Snow (defendant companies)[1] appeal from the judgment rendered by the trial court in favor of the plaintiff, Andreas S. Hadji, on count one of this action alleging breach of a written agreement, dated August 30, 2018 (agreement), that was entered into between the plaintiff and Snow, individually and on behalf of the defendant companies, and with respect to six special defenses and a counterclaim filed by the defendants.[2]

[1] The six companies are Premier Real Estate Services of Connecticut, LLC; Columbus Commons, LLC; CCCA, LLC; Tunxis Road Associates, LLC; Finishers Court, LLC; and JPG Partners, LLC. In this opinion, we refer to these companies collectively as the defendant companies and individually by name when necessary.

[2] In March, 2022, the plaintiff filed a motion, which was granted by the court, to cite in as a defendant Oman Trust, LLC. According to the plaintiff, Snow had fraudulently conveyed to Oman Trust, LLC, certain real property that was the subject of an attachment in accordance with a prejudgment remedy that previously had been granted to the plaintiff. The plaintiff thereafter amended his complaint to add a third count to allege a claim for fraudulent conveyance. In his posttrial brief, however, the plaintiff stated that he no longer was asserting the fraudulent conveyance claim in count

On appeal, the defendants claim that the trial court improperly (1) rejected their second special defense,[3] in which they alleged, inter alia, that Snow did not have apparent authority to enter into the agreement on behalf of the defendant Finishers Court, LLC (Finishers Court),[4] (2) determined that there was proper consideration to support the agreement as to each of the defendant companies, (3) rejected their contention that the interest charged under the agreement was unconscionable, (4) determined that the written agreement constituted the entire agreement between the parties, and (5) calculated damages by double counting the base amount of damages.[5] We agree with the defendants' last claim only and reverse the judgment in part.

The following facts, either stipulated to by the plaintiff or which the court reasonably found, and procedural history are relevant to this appeal. Snow is a real estate

three because the property had been transferred back to Snow. Oman Trust, LLC, is not involved in this appeal. Therefore, our references to the defendants in this opinion are to Snow and the defendant companies only.

[3] We note that, although the defendants' second special defense alleges that "[t]here was no authority for the execution of the agreement by . . . Snow on behalf of the various entities," on appeal the defendants challenge only the court's determination regarding Snow's authority to bind Finishers Court, LLC, to the agreement. We therefore limit our review accordingly.

[4] The defendants also claim that the court improperly found that Snow had actual authority to enter into the agreement on behalf of Finishers Court. Specifically, in their principal appellate brief, they assert that, "if the memorandum of decision is read to indicate a finding that Snow had actual authority [to bind Finishers Court], such finding was clearly erroneous . . . ." We do not read the court's decision as finding that Snow had actual authority to bind Finishers Court. In its decision, the court set forth the companies on behalf of which Snow had actual "authority to enter into the agreement with the plaintiff." Finishers Court was not listed as one of those companies. Instead, in addressing Snow's authority to act on behalf of Finishers Court, the court limited its discussion to whether Snow had apparent authority to bind Finishers Court to the agreement. Accordingly, we need not address the defendants' claim regarding actual authority and limit our review to the court's finding regarding apparent authority.

[5] We note that we address the claims on appeal in an order different from how the claims are set out in the defendants' appellate brief.

developer and the owner/manager of the six defendant companies involved in this action. Those companies, which each have a principal business address of either 110 Court Street or 110 Court Street, Suite 1, in Cromwell, include the defendant Premier Real Estate Services of Connecticut, LLC (Premier), a real estate development company; the defendant Columbus Commons, LLC (Columbus Commons), which owns fourteen town houses in New Britain; the defendant CCCA, LLC (CCCA), which is the condominium association for Columbus Commons; the defendant Tunxis Road Associates, LLC (Tunxis Road), which owns twenty apartments in Bristol; Finishers Court, which owns a twenty unit apartment complex in East Berlin; and the defendant JPG Partners, LLC (JPG), which, at one point, had an interest in Finishers Court. Each company has a separate operating agreement, and Snow is either the sole member, managing member, and/or manager of Premier, Columbus Commons, CCCA, and Tunxis Road. Finishers Court has two founding members, namely, Snow and Gary S. Radler, who is not a party to this action, with each having a 50 percent membership interest. Snow, however, is the managing member of Finishers Court. The trial court specifically found in its memorandum of decision that Snow, "[a]s either the sole or managing member of these corporations . . . controlled the defendant companies . . . ."[6]

In its memorandum of decision, the court set forth the following additional findings. "In 2014 . . . Snow hired the plaintiff to work for his businesses. The plaintiff, prior to working with Snow and the defendant companies, had previously worked for a property management company, primarily leasing units owned or

[6] Snow also owns Diamond Estates, LLC, a construction company that is not a party to this action. Diamond Estates, LLC, performs construction services for the defendant companies, including budgeting and coordinating work performed by subcontractors.

managed by his employer. The plaintiff was interested in further expanding his professional experience in real estate development and management and accepted a position with . . . Snow, who was a member of various businesses which performed such work. . . .

"It is undisputed that at all relevant times, Snow and the defendant companies were engaged in the business of real estate development, construction management, and property management. When [the plaintiff] started working for Snow and the defendant companies, he was initially doing the type of work he had performed at his prior employment, namely, property management and leasing. However, it was his expectation, which he communicated to Snow, that he would gain additional responsibilities in the broader area of real estate development, and this in fact happened. The plaintiff became more involved in the real estate development for Snow and the defendant companies. In sum, the plaintiff credibly testified about the services he provided for Snow and the defendant [companies]. He did the work as directed by Snow for the various entities, working forty to sixty hours per week.

"The plaintiff's compensation while employed by Snow was minimal[7] and sporadic.[8] In 2018, the plaintiff's

---

[7] The plaintiff testified that, when he started working for Snow, he performed services for all of the defendant companies and that he did not receive a weekly paycheck. When questioned on cross-examination, the plaintiff acknowledged that, during the time period of 2014 to 2018, he had received monies from Snow but could not recall the exact amount. Snow testified that he had paid the plaintiff around $110,000 during that time period.

[8] "[Snow] testified that the plaintiff received payments from Diamond Estates, LLC, a nonparty. Snow explained that Diamond Estates [LLC] was the construction side of his businesses. The testimony of Snow that the plaintiff worked for only the construction side of the business is not credible in light of the detailed testimony by the plaintiff about the work he performed for Snow and the defendant [companies]. As for the alleged third-party payments, the payments were only generated the night before trial. Moreover, Snow conceded that the payments were not to be credited against the contractual amounts due under the agreement."

wife's employment required the family to relocate to another state. [The plaintiff] advised Snow that he would also be leaving Connecticut to be with his family. However, in order to facilitate an orderly wrap up of their relationship, the plaintiff agreed to stay in Connecticut to continue working for Snow on some ongoing projects. The parties also discussed [the plaintiff's] compensation for work performed, compensation for work to be performed while he remained in Connecticut after his family departed, and compensation for relinquishment of [the plaintiff's] membership interest in Columbus Commons.[9]

"On August 30, 2018, the parties entered into and executed a written agreement, which is the subject of this contract action.[10] The agreement was executed by

---

[9] The plaintiff testified that Snow had given him an 18 percent equity interest in Columbus Commons and that he did not have to pay for it.

[10] The agreement provides in relevant part: "For compensation for work performed over the last four years (March 2014 to [p]resent) and equity promised . . . Snow . . . and his [c]ompanies (Premier . . . Columbus Commons . . . CCCA . . . Tunxis Road . . . Finishers Court . . . [and] JPG . . .) jointly and severally agree to pay [the plaintiff] . . . as follows . . . ." For short-term compensation, the agreement lists day care reimbursement of $8000 by September 15; credit card reimbursement of $6000 by September 15; a second credit card reimbursement of $6000 by October 1; free rent and accommodations at an apartment in Bristol until the plaintiff moves to Atlanta; airfare to Atlanta every other week until the plaintiff moves to Atlanta; and monthly payments of $2000 for six months beginning February 1, 2019, through July 31, 2019. For long-term compensation, the agreement lists monthly payments of $5000 for five years beginning August 1, 2019, through July 31, 2024; and a final payment of $130,000 by August 1, 2024. Pursuant to the agreement, "[a]ny late payment(s) will accrue 1.5 [percent] compounded monthly interest. Any missed payment(s) totaling more than $20,000 is considered a material breach and will result in the entire unpaid balance of the whole agreement being due and payable within [sixty] days. [Snow] and his [c]ompanies are jointly and severally liable for all payments due under this [a]greement." The agreement further prohibits Snow from selling or transferring Columbus Commons, Tunxis Road, Finishers Court and JPG, and provides that Snow will remove the plaintiff as a member of Columbus Commons effective January 1, 2019, and that the plaintiff would "receive 100 [percent] of any [depreciation] and or losses for tax year 2018 for Columbus Commons . . . ." At the bottom of page two of the agreement, Snow's name is printed, with the following notation

[the plaintiff] and Snow, in his individual capacity and on behalf of the [defendant companies]. The agreement established two forms of compensation for the plaintiff: short-term compensation and long-term compensation. The short-term compensation included day care reimbursement, credit card reimbursement, accommodations, air travel and monthly payments. The long-term compensation included monthly payments of $5000 for five years beginning August 1, 2019, through July 31, 2024, with a final additional payment of $130,000 by August 1, 2024. The agreement provided that any late payment would accrue 1.5 percent compounded monthly interest. The agreement provided that 'any missed payment(s) totaling more than $20,000 is considered a material breach and will result in the entire amount being due and payable within [sixty] days.' The agreement provides that Snow and the defendant [companies] are jointly and severally liable for all payments under the agreement.

"The plaintiff credibly testified that, except for providing airfare on several occasions and providing accommodations, the defendants failed to meet their contractual obligations. With the exception of one payment in the sum of $5000 [made] in approximately June, 2020, the plaintiff received no other long-term compensation payment under the terms of the agreement.[11]" (Footnotes added; footnote in original.) Consequently, the plaintiff commenced the present action in May,

---

in parentheses: "for himself and on behalf of Premier . . . Columbus Commons . . . CCCA . . . Tunxis Road . . . Finishers Court . . . [and] JPG . . . ." After that notation, Snow and the plaintiff each signed and dated the agreement August 30, 2018.

[11] "The plaintiff received a check from Snow on behalf of Diamond Estates, LLC, a nonparty, in the sum of $23,000, dated November 2, 2018, with the caveat that [the plaintiff] should hold the check until there were sufficient funds. [The plaintiff] followed up with Snow to see if he could cash the check, [but] Snow told him not to, as there were insufficient funds. So, the plaintiff never cashed the check."

2021. In a three count amended complaint, filed on March 29, 2022, the plaintiff alleged claims for breach of contract, unjust enrichment and fraudulent conveyance.[12] On May 26, 2022, the defendants filed an answer, along with six special defenses and a counterclaim. The special defenses alleged a lack of consideration to support the agreement, that Snow had no authority to execute the agreement on behalf of the defendant companies, that the written agreement signed by the parties did not constitute their entire agreement, that no fraudulent conveyance took place, that the interest rate charged in the agreement was unconscionable, and that there was no meeting of the minds. In their counterclaim, the defendants alleged that they suffered damages as a result of either the plaintiff's negligent performance of his duties or his failure to perform his duties. A trial to the court took place on April 19, 2023, at which the plaintiff, Snow and Radler testified, and the parties submitted exhibits into evidence. In a memorandum of decision dated June 20, 2023, the court found in favor of the plaintiff on count one, alleging breach of contract,[13] and against the defendants on their special defenses. It also determined that "[t]he defendants did not sustain their burden on the counterclaim alleging that the plaintiff was negligent in his duties and thus liable to the defendants." On the basis of the evidence

---

[12] See footnote 2 of this opinion.

[13] Because the court found that the defendants materially breached the agreement and awarded damages to the plaintiff for the defendants' breach, it did not address the plaintiff's alternative unjust enrichment claim in count two. We note that "[i]t is well-settled that a plaintiff may recover for unjust enrichment when a contract remedy is unavailable, to the extent that the defendant has unjustly profited at the plaintiff's expense. *Horner* v. *Bagnell*, 324 Conn. 695, 707–708, 154 A.3d 975 (2017). In other words, breach of contract and unjust enrichment are mutually exclusive theories of recovery. *Russell* v. *Russell*, 91 Conn. App. 619, 638, 882 A.2d 98, cert. denied, 276 Conn. 924, [888 A.2d 92 (2005), and cert. denied, 276 Conn. 925, 888 A.2d 92 (2005)]." *Kelly* v. *Kurtz*, 193 Conn. App. 507, 537, 219 A.3d 948 (2019); see also *Onthank* v. *Onthank*, 206 Conn. App. 54, 56 n.2, 260 A.3d 575 (2021).

presented, the court awarded damages in the amount of $457,000 under the express terms of the agreement and, further, awarded contractual interest in the amount of $1,021,133.40. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

We first address the defendants' claim that the court improperly rejected their second special defense alleging that Snow did not have apparent authority to enter into the agreement on behalf of Finishers Court.[14] Specifically, the defendants assert that "[t]here is no finding of any acts by the principal—Finishers Court—clothing Snow with apparent authority to enter into the agreement. There is no evidence in the record of any acts by Finishers Court or Radler. The only acts that were relied upon by the trial court were acts by Snow. These are insufficient as a matter of law." Thus, the defendants claim that the court's finding that Snow had apparent authority to enter into the agreement on behalf of Finishers Court is clearly erroneous, as "it lacked any evidentiary support of any kind and rested entirely on an application of the doctrine of apparent authority that was erroneous as a matter of law." We disagree.

The following additional facts are relevant to our resolution of this claim. In its memorandum of decision, the court stated: "In [their] posttrial brief addressing the special defense that Snow did not have authority to sign the agreement, the defendants claim that the plaintiff was aware that Radler was a member of Finishers Court and, therefore, the plaintiff knew or should have known [that] Snow could not act on its behalf. . . . Snow, at all relevant times, held himself out as having authority to enter into the agreement on behalf of Finishers Court. Furthermore, Radler was a passive

---

[14] See footnote 3 of this opinion.

member or investor. Radler did not partake in the management of the business or daily operations. There is no evidence that the plaintiff knew the terms of the Finishers Court operating agreement or that Snow required any consent from Radler to authorize the agreement." (Citation omitted; footnote omitted.) Thus, the court, by rejecting the defendants' second special defense, implicitly found that Snow had apparent authority to bind Finishers Court to the agreement.

The operating agreement for Finishers Court was entered into evidence as an exhibit. It provides that Radler and Snow are the only members, with each holding a 50 percent interest in the business.[15] Section V of the operating agreement sets forth the rights, powers and duties of the manager, Snow. Specifically, § 5.1.2 delineates the general powers of the manager and provides in relevant part: "The [m]anager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this [a]greement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the [c]ompany for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for [c]ompany purposes, the power to . . . 5.1.2.4. enter into agreements and contracts and to give receipts, releases, and discharges, subject, however, to the consent of all the [f]ounding [m]embers [Snow and Radler] . . . ." There is nothing in the record demonstrating that Snow obtained Radler's consent to enter into the agreement with the plaintiff as required for Snow to have actual authority under the operating agreement. Therefore, for Finishers Court to be bound by the agreement, Snow must have acted with apparent authority.

---

[15] We note that Radler testified that he held a 40 percent interest in Finishers Court. That testimony is contradicted by the company's operating agreement, which shows each member as holding a 50 percent interest.

We next set forth our standard of review. "It is well settled that [t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn [therefrom]. . . . Accordingly, [appellate courts] review the trial court's findings with regard to agency and an agent's apparent authority under the clearly erroneous standard.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling.[16] . . .

"With respect to the governing legal principles, it is a general rule of agency law[17] that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the

---

[16] "As a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact." (Internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 274, 976 A.2d 750 (2009).

[17] " 'Agency is defined as the fiduciary relationship that arises when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. 1 Restatement (Third), Agency, § 1.01, p. 17 (2006).' " *Yale University* v. *Out of the Box, LLC*, 118 Conn. App. 800, 807, 990 A.2d 869 (2010).

principal, and within the scope of the agent's employment. . . . An agent's authority may be actual or apparent. . . . Actual authority exists when [an agent's] action [is] expressly authorized . . . or . . . although not authorized, [is] subsequently ratified by the [principal]. . . . In contrast, [a]pparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." (Citations omitted; footnotes added; internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 507–508, 4 A.3d 288 (2010); see also *LeBlanc* v. *New England Raceway, LLC,* 116 Conn. App. 267, 275, 976 A.2d 750 (2009) ("Significantly, our case law provides that authority to perform services on behalf of a principal does not automatically confer either actual or apparent authority to bind the principal in other respects. . . . In particular, [a] principal is bound to contracts executed by an agent only if it is within the agent's authority to contract on behalf of that principal . . . ." (Citation omitted; internal quotation marks omitted.)).

"The issue of apparent authority is one of fact, requiring the trier of fact to evaluate the conduct of the parties in light of all the surrounding circumstances. . . . Only in the clearest of circumstances, where no other conclusion could reasonably be reached, is the trier's determination of fact to be disturbed. . . .

"The issue of apparent authority is . . . to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith,

reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action. . . . The doctrine of apparent authority was developed by the courts to protect third parties who deal with agents who lack express authority. . . . Apparent authority may be derived from a course of dealing." (Citations omitted; internal quotation marks omitted.) *Hall-Brooke Foundation, Inc.* v. *Norwalk*, 58 Conn. App. 340, 345–46, 752 A.2d 523 (2000).

Applying these principles to the facts of the present case and, on the basis of our review of the evidence presented, we conclude that the court's implicit finding that Snow had apparent authority to bind Finishers Court to the agreement with the plaintiff is not clearly erroneous. See *Host America Corp.* v. *Ramsey*, 107 Conn. App. 849, 858, 947 A.2d 957 ("[b]ecause [i]t is well settled that [t]he nature and extent of an agent's authority is a question of fact for the trier . . . the court's determination that [the plaintiff's former chief executive officer] had apparent authority to bind the plaintiff must stand if there is any evidence in the record to support it" (citation omitted; internal quotation marks omitted)), cert. denied, 289 Conn. 904, 957 A.2d 870 (2008); see also *Bank of America, N.A.* v. *Gonzalez*, 187 Conn. App. 511, 521–22, 202 A.3d 1092 (2019); *73-75 Main Avenue, LLC* v. *PP Door Enterprise, Inc.*, 120 Conn. App. 150, 158–59, 991 A.2d 650 (2010). We first note that, although the court's analysis of the issue of Snow's apparent authority to bind Finishers Court is succinct, the evidence in the record, nonetheless, supports a determination that Snow had apparent authority to bind Finishers Court to the agreement.

We turn to the first criterion for finding apparent authority, namely, that "it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in

question, or knowingly permitted [the agent] to act as having such authority." (Internal quotation marks omitted.) *Hall-Brooke Foundation, Inc.* v. *Norwalk*, supra, 58 Conn. App. 345. Our case law directs that "apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal . . . ." (Internal quotation marks omitted.) *Chabad Lubavitch of Western & Southern New England, Inc.* v. *Shemtov*, 349 Conn. 695, 709, 321 A.3d 1107 (2024); see also *Cefaratti* v. *Aranow*, 321 Conn. 593, 602–603, 141 A.3d 752 (2016) ("[t]he apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and *not where the agent's own conduct has created the apparent authority*" (emphasis added; internal quotation marks omitted)). "[T]he acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority." (Internal quotation marks omitted.) *Middlesex Mutual Assurance Co.* v. *Komondy*, 120 Conn. App. 117, 122, 991 A.2d 587 (2010); see also *D'Occhio* v. *Connecticut Real Estate Commission*, 189 Conn. 162, 180, 455 A.2d 833 (1983).

The general rule governing the creation of apparent authority is set forth in the Restatement (Third) of Agency, which provides in relevant part: "Apparent authority . . . is created by a person's manifestation *that another* has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be

authorized and the belief is traceable to the manifestation." (Emphasis added.) 1 Restatement (Third), Agency § 3.03, pp. 173–74 (2006). The general rule governing apparent authority becomes more complicated when, as in the present case, the principal is a company/ organization—Finishers Court—rather than a person. In such circumstances, we must be mindful that Finishers Court, as a limited liability company, can act only through its agents. See *Harp* v. *King*, 266 Conn. 747, 776–77, 835 A.2d 953 (2003) ("A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corporation's agents are attributed to the corporation itself." (Internal quotation marks omitted.)); *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 606, 799 A.2d 1027 (2002) ("[i]t is well settled that a corporation can act only through its agents").

"Apparent authority arises when an organization holds an agent out as possessing the authority to act on its behalf and a reasonably prudent person, exercising diligence and discretion, naturally assumes the agent has this authority in light of the organization's conduct. . . . The doctrine of apparent authority is based on the concept that if an organization, as principal, creates the appearance that a person is its agent, it will not be permitted to deny the agency if an innocent third party reasonably relied on the apparent agency, and is harmed as a result." (Citation omitted.) *Yugoslav-American Cultural Center, Inc.* v. *Parkway Bank & Trust Co.*, 289 Ill. App. 3d 728, 735, 682 N.E.2d 401 (1997). When determining apparent authority in the context of an organization or company as the principal, "a complication arises due to the fact that the delegation of authority is often made by someone who is himself the agent of the ultimate principal—or the sub-agent of an agent,

and so on." *Brunner* v. *United States*, 70 Fed. Cl. 623, 628 (2006); see id., 627–28 ("When the principal is an individual, the matter of authorizing an agent is fairly straight-forward. When the principal is an entity, however, an additional wrinkle is added—the delegation of authority is subject to constitutional rules, embodied in acts or articles of incorporation, corporate charters and the like, as well as processes that are duly-adopted, in such forms as by-laws or board rules."). In this context, "[t]he principal might create the appearance of an agent's authority to contract . . . by employing the agent in a manner to create the appearance (known as 'holding out' the agent)." Id., 628.

Our Supreme Court has explained that "manifestations of apparent authority must take the form of 'conduct by a person, observable by others, that expresses meaning.' [1 Restatement (Third), supra, § 1.03, comment (b), p. 56]. Such conduct, however, 'is not limited to spoken or written words . . . . Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance.' Id., p. 57. Apparent authority also may be conveyed to the third person 'from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communication. Likewise . . . apparent authority can be created by appointing a person to a position . . . which carries with it generally recognized duties . . . to do the things ordinarily entrusted to one occupying such a position . . . .' 1 Restatement (Second), Agency [§ 27, comment (a), p. 104 (1958)]. The Restatement (Third) of Agency similarly explains that '[a] principal may . . . make a manifestation by placing an agent in

a defined position in an organization or by placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so. A principal may make an additional manifestation by permitting or requiring the agent to serve as the third party's exclusive channel of communication to the principal.' " *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 511–12; see also 1 Restatement (Third), supra, § 3.03, comment (c), p. 179 ("[a]pparent authority in an organizational setting may also arise from the fact that a person occupies a type of position that customarily carries specific authority although the organization has withheld such authority from that agent").[18] Therefore, although the defendants claim that the court improperly focused on the conduct of Snow as the agent, we cannot ignore the fact that

[18] See, e.g., *Lisa Cooley, LLC* v. *Native, S.A.*, Docket No. 20-CV-5800 (VEC), 2021 WL 860591, *4 (S.D.N.Y. March 5, 2021) (by appointing person as " 'Chairman' of the company, [the] [d]efendant imbued him with apparent authority to act on its behalf"); see also, e.g., *Federal Deposit Ins. Corp.* v. *Providence College*, 115 F.3d 136, 140 (2d Cir. 1997) (record adequately supported conclusion by District Court that defendant vested agent with "apparent authority to sign . . . loan guarant[ees]" by giving agent title of "Vice President for Business Affairs"); *First Fidelity Bank, N.A.* v. *Government of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 193 (2d Cir. 1989) ("[t]he appointment of a person to a position with generally recognized duties may create apparent authority"); *United States* v. *Inc. Village of Island Park*, 888 F. Supp. 419, 437 (E.D.N.Y. 1995) ("[a]pparent authority is the authority which outsiders would normally assume the agent to have, judging from his position with the corporation and the circumstances of his conduct"); *Powell* v. *MVE Holdings, Inc.*, 626 N.W.2d 451, 459 (Minn. App. 2001) ("[a]lthough a job title alone will not conclusively establish apparent authority for a contract, [a former employee and shareholder's] belief that [the chief executive officer and president of the defendant corporation] was authorized to redeem [the former employee's] stock is traceable, in part, to [the president's] position as [the defendant corporation's] top-ranking executive"), review denied, Minnesota Supreme Court, Docket No. C4-00-1379 (July 24, 2001).

Finishers Court is a limited liability company with only two members, one of whom—Snow—is the managing member through whom the company acts. Also, this legal authority demonstrates that, when a principal is an entity, not a person, the conduct or manifestation of assent by the principal can take many forms; as a result, we must take these factors into consideration in our review of the evidence to determine whether it demonstrates any conduct or manifestation of assent by Finishers Court holding Snow out to have authority to enter into the agreement at issue.

In the present case, Snow was the managing member of Finishers Court, a limited liability company of which there were only two members. Radler, the other member, took a passive role in the company. The court found that Snow had hired the plaintiff to work for his businesses, that the plaintiff worked for all of the defendant companies, that "the plaintiff credibly testified about the services he provided for Snow and the defendant [companies]," and that "[h]e did the work as directed by Snow for the various entities, working forty to sixty hours per week." These findings demonstrate that Snow held a position of authority in the defendant companies, specifically, Finishers Court, such that he could hire employees and direct their work. As a result, Finishers Court, by placing Snow in a position of authority as the managing member of the company and permitting him to carry on business for the company, including hiring employees, created an appearance or held out that Snow had authority to manage the company, which authority could include entering into an employment contract with an employee on behalf of the company.[19]

---

[19] The circumstances of the present case are analogous to those in *Pittman Place Development, LLC* v. *Howard Investments, LLC*, 330 S.W.3d 519 (Mo. App. 2010), transfer denied, Missouri Supreme Court, Docket No. SC91456 (March 1, 2011). In that case, the plaintiff limited liability company argued that its designated manager, Matt Burghoff, lacked authority to enter into a loan transaction with a bank in which Burghoff executed a promissory note and deed of trust. Id., 523. The trial court found that Burghoff had

Furthermore, our Supreme Court has explained that "manifestations of apparent authority may take many forms"; *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 515; including, for example, a course of dealing. See *Hall-Brooke Foundation, Inc.* v. *Norwalk*, supra, 58 Conn. App. 346 ("[a]pparent authority may be derived from a course of dealing" (internal quotation marks omitted)). The evidence before the court demonstrated that, prior to entering into the agreement, the plaintiff worked for Snow over a four year period. The court found that, during that time period, "[t]he plaintiff became more involved in real estate development for Snow and the defendant companies. . . . He did the work as directed by Snow for the various entities, working forty to sixty hours per week." The plaintiff testified that he worked for all of the defendant companies,

apparent authority to enter into the loan transaction, and the Missouri Court of Appeals affirmed that determination. Id. In doing so, the court stated: "When a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act on behalf of his principal, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform the act." (Internal quotation marks omitted.) Id., 527. The court held that the plaintiff company "cloaked Burghoff with apparent authority when it manifested its consent for Burghoff to act as '[m]anager' of [the plaintiff company] in [its] [o]perating [a]greement, and gave the '[m]anager' general authority to enter into transactions such as the . . . loan transaction." Id., 528. The court further explained: "Although granting the manager broad authority over [the plaintiff's] business affairs, the [o]perating [a]greement placed limits on that authority, and required the consent of all members if the manager, among other things, sought to 'sell, assign, pledge, or encumber any property of [the plaintiff],' with a value in excess of $50,000. . . . [T]he trial court found that [the bank] was unaware of the $50,000 limitation on the manager's authority," and the Missouri Court of Appeals deferred to the trial court's credibility determination on that issue. Id. The court ultimately determined that there was substantial evidence to support the trial court's finding of apparent authority, explaining that the plaintiff's "[o]perating [a]greement provide[d] evidence that [the plaintiff company] manifested its consent to Burghoff's exercise of such authority, or knowingly permitted Burghoff to assume the exercise of such authority." Id., 529.

doing "whatever [Snow] had asked [him] to do." Therefore, through this course of dealing over a four year period, Finishers Court either manifested its consent to allow Snow to act as its authorized agent in conducting the business of the company or knowingly permitted him to do so.

With respect to the second criterion—whether the plaintiff had a good faith, reasonable belief that Snow had the necessary authority to bind Finishers Court— the court found that "Radler was a passive member or investor" of Finishers Court who "did not partake in the management of the business or daily operations." The court also found that "[t]here [was] no evidence that the plaintiff knew the terms of the Finishers Court operating agreement or that Snow required any consent from Radler to authorize the agreement." These findings, by implication, concern the reasonableness of the plaintiff's belief that Snow had authority to enter into the agreement on behalf of Finishers Court. In *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 512, our Supreme Court explained that, " '[i]f a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority.' . . . [1 Restatement (Third), supra, § 3.03, comment (b), pp. 174–75]." Analogizing that principle to the circumstances of the present case, we note that Snow, as the manager of Finishers Court and pursuant to its operating agreement, had the "full, exclusive, and complete discretion, power, and authority . . . to manage, control, administer, and operate the business and affairs of the [c]ompany," which included the power to "enter into agreements and contracts . . . ." Thus, Snow was

given general authority to engage in a class of transactions, namely, entering into agreements and contracts, that was subject to limits known only by Snow and Radler.[20] The plaintiff, therefore, reasonably could have believed that Snow was authorized to do acts consistent with his position, including having the power to enter into the employment agreement on behalf of Finishers Court, and did not need to inquire "into the existence of undisclosed limits on [Snow's] authority"; (internal quotation marks omitted) *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 512; especially given the court's finding that the plaintiff had no such knowledge of the terms of the operating agreement. The evidence in the record supports a finding that the plaintiff reasonably could have believed that Snow had authority to enter into the employment agreement on behalf of Finishers Court.

Moreover, we note that the court specifically found not credible Snow's testimony that the plaintiff worked for only Diamond Estates, LLC, which represented the construction side of the business, and not for the defendant companies. Nevertheless, the defendants continue to assert on appeal that the plaintiff never performed "any substantial services" for Finishers Court and, thus, that it was not reasonable for the plaintiff to assume that Snow had apparent authority to bind Finishers

---

[20] We find unavailing the defendants' contention that, "whatever apparent authority Snow [may have] had due to being given the title of manager and being placed in charge of day-to-day affairs did not extend to transactions outside the ordinary course of the company's business," such as the employment contract that Snow entered into with the plaintiff. The operating agreement for Finishers Court expressly provided Snow as the manager with "full, exclusive, and complete discretion, power, and authority . . . to manage, control, administer, and operate the business and affairs of the [c]ompany," which included the power to "enter into agreements and contracts . . . ." The authority provided to Snow under the operating agreement is not limited to what the defendants refer to as "day-to-day business" and expressly includes the authority to enter into the type of transaction at issue in this case, subject to a limitation known only to Snow and Radler.

Court. This court is bound by and cannot second-guess the credibility determinations made by the trial court as the trier of fact. "[I]t is well established . . . that the evaluation of a witness' testimony and credibility are wholly within the province of the trier of fact. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom. . . . Thus, while we may review the court's underlying factual determinations under the clearly erroneous standard, our review requires us to defer to the court's evaluation of the plaintiff's credibility relative to that of the defendant." (Internal quotation marks omitted.) *Al-Fikey* v. *Obaiah*, 196 Conn. App. 13, 18, 228 A.3d 668 (2020).

We conclude that there is evidentiary support in the record for the determination that Snow had apparent authority to bind Finishers Court to the parties' agreement. "The issue of apparent authority is one of fact, requiring the trier of fact to evaluate the conduct of the parties in light of all the surrounding circumstances. . . . Only in the clearest of circumstances, where no other conclusion could reasonably be reached, is the trier's determination of fact to be disturbed." (Internal quotation marks omitted.) *Hall-Brooke Foundation, Inc.* v. *Norwalk*, supra, 58 Conn. App. 345; see also *D'Occhio* v. *Connecticut Real Estate Commission*, supra, 189 Conn. 180. This case does not present such a circumstance. Accordingly, affording every reasonable presumption in favor of the court's ruling, as we must; see *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 508; we reject the defendants' first claim.

II

The defendants' next claim is that the court improperly determined that there was proper consideration to support the agreement as to each of the defendant companies. We disagree.

"To be enforceable, a contract must be supported by consideration. . . . The doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. . . . Put another way, [u]nder the law of contract, a promise is generally not enforceable unless it is supported by consideration. . . . [C]onsideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee . . . . [T]he doctrine of consideration does not require or imply an equal exchange between the contracting parties. . . . Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (Citation omitted; internal quotation marks omitted.) *Schimenti Construction Co.*, *LLC* v. *Schimenti*, 217 Conn. App. 224, 235, 288 A.3d 1038 (2023).

"Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Although an exchange of promises usually will satisfy the consideration requirement . . . a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." (Internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Eichten*, 184 Conn. App. 727, 776, 196 A.3d 328 (2018). "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard. . . . The conclusion drawn from the facts so found, i.e., whether a particular

set of facts constitutes consideration in the particular circumstances, is a question of law . . . and, accordingly, is subject to plenary review." (Internal quotation marks omitted.) *Kinity* v. *US Bancorp*, 212 Conn. App. 791, 830, 277 A.3d 200 (2022).

"It is well established in our case law that the exchange of promises is sufficient consideration to support a finding of the existence of a contract. *Christophersen* v. *Blount*, 216 Conn. 509, 511 n.3, 582 A.2d 460 (1990); see also *Coniglio* v. *White*, 72 Conn. App. 236, 243 n.5, 804 A.2d 990 (2002) ([m]utual promises qualify as sufficient consideration for a binding contract); 17A Am. Jur. 2d 147, Contracts § 128 (2004) ([m]utual promises are generally held to be sufficient consideration for each other; a promise by one party to an agreement is sufficient consideration for a promise by the other party)." (Internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 641–42, 882 A.2d 98, cert. denied, 276 Conn. 924, 888 A.2d 92 (2005), and cert. denied, 276 Conn. 925, 888 A.2d 92 (2005).

In the present case, the agreement provides in relevant part: "For compensation for work performed over the last four years (March 2014 to present) and equity promised . . . Snow . . . and [the defendant] [c]ompanies . . . jointly and severally agree to pay [the plaintiff] . . . as follows . . . ." The agreement then sets out short-term and long-term compensation to which the plaintiff was entitled under the agreement. The agreement also required Snow to remove the plaintiff as a member of Columbus Commons effective January 1, 2019. The court specifically found that "the plaintiff agreed to stay in Connecticut to continue working for Snow on some ongoing projects" after the plaintiff's family left Connecticut, that the plaintiff's continued work for Snow was part of their discussions prior to entering into the agreement, and that the plaintiff "continued to perform services after the execution of the

agreement" and promised "to relinquish his membership interest in Columbus Commons . . . ."

In addressing the issue of consideration, the court correctly noted, quoting *Osborne* v. *Locke Steel Chain Co.*, 153 Conn. 527, 533, 218 A.2d 526 (1966), "[t]he general rule . . . that past services will not constitute a sufficient consideration for an executory promise of compensation for those services." (Internal quotation marks omitted.) It follows that the plaintiff's "work performed over the last four years" could not constitute valid consideration for the agreement to pay him for that work. The court, however, further quoting *Osborne*, also pointed out that "[i]t is well established . . . that if two considerations are given for a promise, only one of which is legally sufficient, the promise is nonetheless enforceable." (Internal quotation marks omitted.) See *Osborne* v. *Locke Steel Chain Co.*, supra, 533; see also 1 A. Corbin, Contracts (1963) § 126, p. 538; 1 S. Williston, Contracts (3d Ed. 1957) § 134, pp. 564–65. The court thus found that the plaintiff's continued performance of services and his promise to give up his 18 percent interest in Columbus Commons constituted adequate consideration in exchange for the defendants' promises to pay, as set forth in the agreement.

On appeal, the defendants' challenge to the court's finding that the agreement was supported by consideration is premised on their assertions that the plaintiff "did not provide services directly to any of the entities, including, but not limited to, Finishers Court. . . . [The plaintiff] admits he worked directly for . . . Snow, not for any entity . . . . [The plaintiff] never received any monies from CCCA, which is merely a management company, or from Finishers Court . . . . There is no evidence that [the plaintiff] worked directly for CCCA or Finishers Court. There cannot be consideration to support the agreement if [the plaintiff] did no work for those entities." (Citations omitted.) The court rejected

these assertions. The defendants' claim fails for two reasons. First, the court found not credible Snow's testimony that the plaintiff worked directly for Diamond Estates, LLC, only and not the defendant companies, "in light of the detailed testimony by the plaintiff about the work he performed for Snow and the defendant [companies]." As we have stated, this court is bound by and cannot second-guess the credibility determinations made by the trial court as the trier of fact. See *Al-Fikey* v. *Obaiah*, supra, 196 Conn. App. 18. Second, and more importantly, the defendants' principal appellate brief focuses on the past work performed by the plaintiff, which, as we have stated, does not constitute valid consideration for the agreement to pay him, and it was not the basis for the court's finding of consideration to support the agreement. The court found that the plaintiff continued to perform work for the defendant companies after the execution of the agreement and that the plaintiff promised to, and did, relinquish his membership interest in Columbus Commons, and, in exchange, the defendants promised to make payments to the plaintiff as set forth in the agreement.[21] The defendants have not addressed these other grounds for the court's decision in either their principal or reply appellate briefs, even though the plaintiff raised these grounds in his appellate brief. Consequently, the defendants, as the appellants, have not met their burden of demonstrating error in the court's ruling. See *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 64, 485 A.2d 1296 (1985) ("[t]he appellant . . . bears the burden to show that there was error in the judgment from which he appeals"). This claim, therefore, fails.

---

[21] See, e.g., *Ellis* v. *Emhart Mfg. Co.*, 150 Conn. 501, 505, 191 A.2d 546 (1963) (issuance of stock option to employee constituted contract between employer and employee, supported by consideration of employee's continued employment with company); *Dolak* v. *Sullivan*, 145 Conn. 497, 503–504, 144 A.2d 312 (1958) (consideration for retirement plan was employee's continued employment).

### III

The defendants next claim that the court improperly failed to find that the interest charged under the agreement is unconscionable. We conclude that this claim is inadequately briefed and, thus, decline to review it.

The following additional facts are relevant to this claim. The parties' agreement specifically provides in relevant part: "Any late payment(s) will accrue 1.5 [percent] compounded monthly interest. Any missed payment(s) totaling more than $20,000 is considered a material breach and will result in the entire unpaid balance of the whole agreement being due and payable within [sixty] days. [Snow] and his [c]ompanies are jointly and severally liable for all payments due under this [a]greement." In its memorandum of decision, the court rejected the defendants' special defense claiming that the interest provision in the agreement is " 'usurious and [that] the entire agreement should be unenforceable.' " Specifically, the court stated: "The defendants, in their posttrial brief, raise General Statutes § 37-4 in support of the claim. However . . . § 37-4, which applies to loans, is inapplicable. There is no evidence or claim that the agreement is a loan. . . . In the present case, the parties expressly agreed upon the interest provision. The plaintiff presented the calculation of interest using the time period of December 1, 2018, to June 1, 2023, and compounding the interest at 1.5 percent monthly . . . ." (Citation omitted; footnote omitted.)

On appeal, the defendants contend: "The [plaintiff] claimed there was an amount due of $1,021,133.40 consisting of $457,000 in principal and interest of $564,133.40. . . . The interest is based upon a rate of 1.5 percent compounded monthly. Thus, in almost five years, the interest has exceeded the principal amount claimed due. The effective interest rate well exceeds

40 percent on the original principal amount and will soon be higher in the future. . . . Compound interest is interest on interest and in the fourth year of the agreement, the plaintiff is claiming $153,782.81 in interest, which is about 33 percent of the original claimed amount. The annual interest rate will soon exceed 50 percent on the original principal amount and will quickly approach 100 percent. This certainly is usurious and unconscionable. The interest rate charged should be thrown out completely as it is unconscionable and usurious[22] and . . . against public policy[23] . . . .

[22] "The prohibition against usury is based on the principle that it is unconscionable to charge excessive interest on loans of money to those who are forced by necessity to borrow it." (Internal quotation marks omitted.) *Knights of Columbus Federal Credit Union* v. *Salisbury*, 3 Conn. App. 201, 209, 486 A.2d 649 (1985). As the trial court correctly noted, the present case involves a contract voluntarily entered into between the parties, not a loan, and the defendants have not provided citation to any statute or applicable case law in support of their claim that the agreement is usurious and should not be enforced. Any such claim, therefore, is deemed abandoned due to inadequate briefing, and we decline to review it. See *1st Alliance Lending, LLC* v. *Dept. of Banking*, 229 Conn. App. 664, 704–705, 328 A.3d 681 (2024) ("[w]here a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned" (internal quotation marks omitted)), cert. denied, 351 Conn. 906, 330 A.3d 132 (2025); *Lafferty* v. *Jones*, 229 Conn. App. 487, 493, 327 A.3d 941 (2024) ("we deem claims on appeal to be abandoned if they are inadequately briefed"), cert. denied, 351 Conn. 923, 333 A.3d 105 (2025), and cert. denied, 351 Conn. 923, 333 A.3d 106 (2025).

[23] To the extent that the defendants claim that the agreement violates public policy, we conclude that any such claim is inadequately briefed and, thus, decline to review it. The defendants quote *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326, 885 A.2d 734 (2005), for the proposition that, "[a]lthough it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable." (Citation omitted; internal quotation marks omitted.) In a single sentence, the defendants assert that, "[i]f there is a case where the interest rate is unconscionable and against public policy, this is it." Their brief is devoid of any argument or analysis concerning which public policy is implicated by the terms of the agreement or how the agreement purportedly violates it. See *State ex rel. Dunn* v. *Burton*, 229 Conn. App. 267, 285, 327 A.3d 982 (2024) ("[w]here the parties cite no law and provide no analysis of their claims, we do not review such claims" (internal quotation marks omitted)).

[T]he entire agreement should not be enforceable." (Citations omitted; footnotes added.) The defendants quoted one case, *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326–27, 885 A.2d 734 (2005), for the proposition that, "[a]lthough it is well established that parties are free to contract for whatever terms on which they may agree . . . it is equally well established that contracts that violate public policy are unenforceable." (Citation omitted; internal quotation marks omitted.) The defendants have not cited any case law concerning the doctrine of unconscionability or demonstrating that compound interest at a monthly rate of 1.5 percent is usurious. Instead, the defendants, without engaging in any legal analysis, make bald assertions, which are insufficient to establish unconscionability. See *Emigrant Mortgage Co.* v. *D'Agostino*, 94 Conn. App. 793, 801–803, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006). "We are not required to review issues that have been improperly presented to this court through an inadequate brief . . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Pascual* v. *Perry,* 230 Conn. App. 483, 502–503, 330 A.3d 161 (2025); see also *State ex rel. Dunn* v. *Burton,* 229 Conn. App. 267, 285, 327 A.3d 982 (2024) ("[w]here the parties cite no law and provide no analysis of their claims, we do not review such claims" (internal quotation marks omitted)). We therefore decline to address this claim further.

IV

The defendants' next claim is that the court improperly failed to find that certain correspondence between Snow and the plaintiff was part of the agreement between the parties. We decline to review this claim because it is inadequately briefed.

The following additional facts are relevant to this claim. At trial, the defendants submitted into evidence as a full exhibit copies of two emails sent between Snow and the plaintiff on August 15, 2018 (August 15 emails). The first email is from Snow to the plaintiff and reads: "I do not agree with the contract or agreement concepts you are trying to get agreed to. You were hired here to bring deals that make financial sense. The agreement you are trying to sign put[s] [too] much of a burden on the entities. As an example: What if units don't cash flow or remain vacant. To date you have brought tenants to New Britain and Bristol which have cost significant money to remove from the premise[s]. I believe you should be financially responsible for this. I don't want to make this a prolonged process. I would simply want you to be done and out. I have [too] much going on to spend a lot of time on what you know to be a false premise. The only way I can agree to this is if you agree that any of this agreement is based on the financial performance of Columbus Commons. The other entities have nothing to do with you. Please remove Tunxis Road, Finishers Court and any personal reference to myself and I can agree to that. Let me know if not then we will not have an agreement." The second email is the plaintiff's response, which reads: "Ok I don't want this to be a long process either. I want to be rewarded if projects turn out as stated. I have worked hard to bring them this far and if projects end up not performing as I have projected then I should not be compensated as outlined. I don't want to make this part of the agreement."

In its memorandum of decision addressing this issue, the court stated: "Finally, the defendant[s] [have] not demonstrated under [their] special defense that the agreement is not the entire agreement. First, Snow testified that he signed the agreement after reviewing it and discussing it with the plaintiff. While Snow alleged and testified that he understood that payment would be made only if the projects on which the plaintiff worked performed well, the court does not find his testimony credible. Snow was an experienced business person, operating several companies. While the defendant[s] may have preferred other terms, with the benefit of hindsight, there is no such term in the contract. 'The defendant cannot now be heard to claim, for its own benefit, that the actual undertaking of the parties was other than that which appears in their written agreement.' [*Osborne* v. *Locke Steel Chain Co.*, supra, 153 Conn. 531]. In sum, the court finds that the written agreement was clear, concise and complete."

On appeal, the defendants contend that the August 15 emails constitute a side agreement and acknowledge that Snow "should have incorporated [that] side agreement into the written agreement . . . ." Nevertheless, they assert that his failure to do so "does not mean that it was not part of the understanding between the parties" and that the court "erred in not reading the two documents together." The defendants further assert that "[a] side agreement is an extra agreement that goes along with another agreement," and "[t]he August 15 email[s] [constitute] such a side agreement." According to the defendants, "Snow testified that he relied upon the email statement of [the plaintiff] . . . . [The plaintiff] and the court ignored the side agreement that [the plaintiff] reached with Snow as mere 'small talk' even though Snow relied on it. Such side agreements or side letters are allowed and are enforceable. [*Chemours Co. FC*, *LLC* v. *Chemtura Corp.*, Superior

Court, judicial district of Waterbury, Docket No. CV-14-6024285-S (August 7, 2018), rev'd on other grounds sub nom. *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, 336 Conn. 194, 244 A.3d 130 (2020)]."[24] Finally, the defendants argue that, because "[t]he agreement being sued upon did not contain a complete integration clause, which provides that an agreement supersedes all other agreements and contains the entire agreement between the parties . . . the agreement of August 30 [2018] should be read together with the [August 15 emails] . . . ."[25] They expound on this contention in their appellate reply brief, stating: "There is no reasonable way to interpret the August 15 email exchange except as an agreement that payment would be tied to financial performance and that this term would not be included in the contemplated formal agreement—i.e., that the formal agreement would not be an integrated agreement that stated all terms of the overall agreement." (Emphasis omitted.) According to the defendants, because the court's decision contains no reference to the documentary evidence of the August 15 emails, the court simply must have overlooked that evidence in reaching its decision and, in doing so, committed clear error.

The defendants' arguments on appeal can be distilled to a claim that the August 30, 2018 agreement is not the

---

[24] We note that this Superior Court decision involved the application of New York law; *Chemours Co. FC, LLC* v. *Chemtura Corp.*, supra, Superior Court, Docket No. CV-14-6024285-S; and, moreover, was reversed by our Supreme Court on appeal. See *E. I. du Pont de Nemours & Co.* v. *Chemtura Corp.*, 336 Conn. 194, 196, 244 A.3d 130 (2020).

[25] "A merger clause, also known as an integration clause, is '[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract.' Black's Law Dictionary (12th Ed. 2024) p. 962." *Benchmark Municipal Tax Services, Ltd.* v. *899 ETG Associates, LLC*, 227 Conn. App. 474, 478 n.3, 322 A.3d 1118 (2024). Although the defendants call attention to the fact that the agreement does not contain a merger or integration clause, "the mere absence of a merger clause does not render a contract incomplete or ambiguous." Id., 486 n.6.

entire agreement of the parties. As we have indicated, in support of this assertion in their principal appellate brief,[26] the defendants cite a Superior Court case in which the court applied New York law and which our Supreme Court reversed on appeal, with no analysis of how that case applies to the present one. See footnote 24 of this opinion. For an appellate court "judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . *State* v. *Claudio C.*, 125 Conn. App. 588, 600, 11 A.3d 1086 (2010), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011); see also *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 413, 107 A.3d 931 (2015) (claim was inadequately briefed when appellants undertook no analysis or application of the law to the facts of [the] case)." (Internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016). It is incumbent on parties to provide meaningful analysis of a claim raised on appeal, which includes citation to relevant legal authority *and* an application of that law to the facts at hand. The defendants' discussion of this claim in their principal appellate brief, which is about one page in length, does not set forth any applicable law governing the construction of contracts[27] or when

[26] The defendants' reply brief is similarly deficient. The defendants cite two Superior Court cases for the proposition that a contract may "be created by communications stated in emails." See *D'Amore* v. *Probert*, Docket No. CV-10-5029350-S, 2012 WL 6634683 (Conn. Super. November 29, 2012); *Raidna* v. *Anderson*, Docket No. CV-07-75004170-S, 2008 WL 5148855 (Conn. Super. November 6, 2008). Both of those cases are inapposite, however, as they involved situations in which the parties engaged in email exchanges, without reducing those exchanges into a written agreement that was signed by each party, as had occurred in the present case, and the court found the emails to constitute a binding contract in each case. See *D'Amore* v. *Probert*, supra, *3; *Raidna* v. *Anderson*, supra, *2.

[27] "It is well established that [a] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances

## a court may look outside the four corners of a contract

connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . The interpretation of definitive contract language is a question of law over which our review is plenary. . . . *AGW Sono Partners, LLC* v. *Downtown Soho, LLC*, 343 Conn. 309, 322, 273 A.3d 186 (2022).” (Citation omitted; internal quotation marks omitted.) *Smith* v. *H. Pearce Real Estate Co.*, 232 Conn. App. 82, 93,    A.3d    (2025).

“[If] a party asserts a claim that challenges the trial court’s construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . [If] the language of a contract is ambiguous, the determination of the parties’ intent is a question of fact, and the trial court’s interpretation is subject to reversal on appeal only if it is clearly erroneous. . . . A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . Accordingly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party’s subjective perception of the terms. . . .

“In ascertaining the intent of contracting parties, we are also mindful that a court’s interpretation of a contract must also be informed by whether the terms of the contract are contained in a fully integrated writing. This is important because [t]he parol evidence rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract. . . . The parol evidence rule does not apply, however, if the written contract is not completely integrated.” (Internal quotation marks omitted.) *Johnson* v. *Vita Built, LLC*, 217 Conn. App. 71, 84–85, 287 A.3d 197 (2022).

In the present case, the agreement did not contain an integration clause, and the court thus permitted the parties to present testimony and documentary evidence concerning the circumstances surrounding the making of their agreement. “Whether the written contract was actually the final repository of the oral agreements and dealings between the parties depends on their intention, evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances. If the evidence leads to the conclusion that the parties intended the written contracts to contain the whole agreement, evidence of oral agreements is excluded, that is, excluded from consideration in the determination of the rights and obligations of the litigants, even though it is admitted on the issue of their intention.” (Internal quotation marks omitted.) *Medical Device Solutions, LLC* v. *Aferzon*, 207 Conn. App. 707, 730, 264 A.3d 130, cert. denied, 340 Conn. 911, 264 A.3d 94 (2021). Notably, on appeal, the defendants have not raised any claim that the August 30, 2018 agreement is ambiguous, such that extrinsic evidence,

and consider additional documents for its terms, let alone any analysis of relevant law to the facts of this case.[28] Instead, their brief consists primarily of conclusory assertions that the "side agreement" embodied in the August 15 emails should be considered as part of the "main agreement . . . ."[29] We conclude that this claim is inadequately briefed and, thus, decline to review it.[30] See *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016) ("[c]laims are . . . inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record" (internal quotation marks omitted)); see, e.g., *State ex rel. Dunn* v. *Burton*, supra, 229 Conn. App. 310–11 (declining to review claim when defendant's

including the August 15 emails, is needed to construe its terms. Rather, in a conclusory fashion, they assert that the August 15 emails constitute a "side agreement" that must be considered with the "main agreement . . . ."

[28] We do note that the defendants' appellate reply brief contains a single citation to authority for the proposition that the interpretation of a contract involves a matter of law subject to plenary review.

[29] At trial, Snow testified that he entered into the agreement "[a]gainst [his] better judgment" and that he "should have spent more time on what [he] was actually agreeing to." The defendants also acknowledge in their appellate brief that Snow should have incorporated the "side agreement" into the August 30, 2018 written agreement. From this, it appears that Snow regrets having entered into the agreement with the plaintiff and would like this court to invalidate it. "[C]ourts [however] do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement . . . ." (Internal quotation marks omitted.) *New Milford* v. *Standard Demolition Services, Inc.*, 212 Conn. App. 30, 57, 274 A.3d 911, cert. denied, 345 Conn. 908, 283 A.3d 506 (2022).

[30] Even if this court were to review the defendants' claim and to construe the agreement as ambiguous, the trial court specifically found not credible Snow's testimony "that he understood that payment would be made only if the projects on which the plaintiff worked performed well . . . ." We are bound by that credibility determination and cannot disregard it. See *Al-Fikey* v. *Obaiah*, supra, 196 Conn. App. 20.

brief contained no meaningful analysis, no citations to relevant legal principles, and no analysis of how facts of case related to applicable case law); *C. W.* v. *Warzecha*, 225 Conn. App. 137, 147, 314 A.3d 617 (2024) (claim was deemed inadequately briefed when defendant provided no applicable legal authority or meaningful analysis in support of claim); *Kelib* v. *Connecticut Housing Finance Authority*, 100 Conn. App. 351, 353, 918 A.2d 288 (2007) (declining to review claim when "brief . . . [was] bereft of any meaningful legal analysis"); *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, 62 Conn. App. 1, 10, 773 A.2d 952 (2001) ("[w]here the parties cite no law and provide no analysis of their claims, we do not review such claims").

V

Finally, we address the defendants' claim concerning the court's award of damages. Specifically, the defendants claim that the "court committed clear error in double counting the base amount of damages in its calculation of total damages." The court awarded base damages in the amount of $457,000 for breach of contract. With respect to contractual interest, the court used a calculation set forth by the plaintiff in his posttrial brief, in which the plaintiff calculated the amount of interest due to be $564,133.40, which, when added to the base damages, equals $1,021,133.40. In its memorandum of decision, however, the court stated: "Based upon the credible evidence presented at trial, the court awards damages under the express terms [of the] contract in the sum of $457,000. The court further awards contractual interest [as discussed previously in its decision] in the sum of $1,021,133.40. . . . For all the foregoing reasons, judgment enters for the plaintiff and against the defendants, jointly and severally, in the amount of $457,000, together with interest in the amount of $1,021,133.40, plus costs." The total damages awarded by the court, therefore, amounted to

$1,478,133.40. Although the court had adopted the plaintiff's calculation of interest, which it specifically found the defendants did not dispute, it made an award of interest in the amount of $1,021,133.40, the figure reached by the plaintiff after adding base damages of $457,000 and interest in the amount of $564,133.40. The plaintiff does not take issue with this claim and states in his appellate brief that he "will defer to this court's calculation on the amount owed."

"Our standard of review applicable to challenges to damages awards is well settled. . . . [T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . [If], however, a damages award is challenged on the basis of a question of law, our review [of that question] is plenary." (Internal quotation marks omitted.) *AAA Advantage Carting & Demolition Service, LLC* v. *Capone*, 221 Conn. App. 256, 285, 301 A.3d 1111, cert. denied, 348 Conn. 924, 304 A.3d 442 (2023), and cert. denied, 348 Conn. 924, 304 A.3d 442 (2023).

In this appeal, the defendants challenge only the court's "double counting" of the base amount of damages and not the amount of the plaintiff's calculation of the interest owed, which the court clearly meant to use in fashioning its damages award. We conclude that the damages awarded by the court incorrectly include duplicative base damages. Accordingly, the case must be remanded with direction to render judgment in the total amount of $1,021,133.40, which includes base damages of $457,000 and interest in the amount of $564,133.40.

The judgment is reversed with respect to the award of damages and the case is remanded with direction to

render judgment awarding damages in the total amount of $1,021,133.40; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.